THOMAS (GREY v.)   See Case No. 5,806.

## Case No. 13,899.

THOMAS et al. v. HATCH.

[3 Summ. 170.] [1]

Circuit Court, D. Maine. July Term. 1838.

COURTS — STATE ADJUDICATIONS — DEEDS — HOW CONSTRUED — BOUNDARIES — PLAT — CO-TENANTS — SEISIN — INSANITY — NEW TRIAL.

1. The courts of the United States are not bound, in the interpretation of deeds, by the local adjudications of a particular state.

[Cited in Edwards v. Davenport, 20 Fed. 763.]

2. Deeds are always construed according to the force of the language used by the grantor, and the apparent intentions of the parties deducible therefrom.

[Cited in Richardson v. Palmer, 38 N. H. 218.]

3. The following words followed the granting part of a deed: "A certain tract of land, of which only five eighths, common and undivided, is the property of J. D. (the grantor), and is hereby conveyed, with the exceptions of about ten acres of land conveyed by deed to W. H., &c., &c., and also one acre conveyed by deed to R., &c., and also a strip of land, &c., containing one eighth of an acre, &c., which exceptions are reserved out of the five eighths as aforesaid." Held, that the grantor conveyed nothing in the excepted parcels, but five undivided eighths in the remainder of the tract.

4. A boundary "on a stream," or "by a stream," or "to a stream," includes the flats, at least to low water-mark, and, in many cases, to the middle thread of the river. Quære; how it would be where the boundary was "on the bank" of a river.

[Cited in Alabama v. Georgia, 23 How. (64 U. S.) 513.]

[Cited in Buttenuth v. St. Louis Bridge Co., 123 Ill. 548, 17 N. E. 439. Cited in brief in State v. Wilson, 42 Me. 15. Cited in City of Boston v. Richardson, 13 Allen, 155, 105 Mass. 355   Cited in brief in Stover v. Jack, 60 Pa. St. 341.]

5. A boundary on the bank of a river, referring to fixed monuments on the bank, limits the grant to the bank, and excludes the flats.

6. Where a tenant in common is non compos, and under guardianship, a partition-deed executed by the co-tenants, and by the guardian, is good to pass the title of the ward, at least until it is avoided by the non compos, or by those claiming in privity of estate under him.

7. Papers from the probate records, showing that a person was treated by the probate court as the lawful guardian of a non compos, will be received as prima facie evidence, after a long lapse of time, to supply the direct proof of a probate appointment.

8. A plan of a tract of land, which is referred to in a deed, for purposes of description, is to be treated as if it were annexed to, and made part of, the deed.

[Cited in Trustees of First Evangelical Church v. Walsh, 57 Ill. 368.]

9. In cases of co-tenants, where there is no visible adverse seizin of any part of the land, an entry by one of the co-tenants gives a seizin of the whole, according to their titles.

[Cited in brief in Ramberg v. Wahlstrom, 140 Ill. 184, 29 N. E. 727   Cited in Dubois v. Campan, 28 Mich. 316. Cited in brief in Avery v. Hall, 50 Vt. 12.]

10. Where there was a deed from the state, conveying all the right, title, and interest of the state unto a "lot of land numbered ten, as was surveyed by Park Holland, in the year 1801," which deed, in the specific boundaries, bounded

1 [Reported by Charles Sumner, Esq.]

the lot on one side to a stake, and thence "to the bank of the river, thence by the bank of the river to the first-mentioned bounds"; and in the plan the lot was laid down bounded on the river; quære, whether taking the whole description together, it did not convey the lot to the stream, and include the flats.

[Cited in brief in Com. v. City of Roxbury, 9 Gray, 474; Smith v. City of St. Louis, 21 Mo. 38.]

11. If a plan is referred to in a deed, and the land, according to that plan, is bounded on a river, with no other specific boundaries than the river, semble, that the flats will pass, by operation of law, with the upland.

12. Persons entering upon lands, belonging to the state, are to be deemed mere intruders; yet, as against all other persons, the entry will be a sufficient seisin to support a writ of right.

13. Where demandants show a seisin, that will be presumed to continue until some adverse seisin, or disseisin, is shown.

14. Quære; what is the effect upon the rights of co-tenants, of a conveyance by one tenant in common of the entirety of one part of the lands held in common?

15. A verdict was set aside on the ground, that it could not have been found by the jury, without, either disregarding the instructions of the court in point of law, or giving an effect to evidence, which, in a just and legal sense, was not proper

Writ of right on the seisin of the demandants. Plea, the general issue, and joinder on the mise. At the trial, at May term, 1837, it appeared that the demandants [James Thomas and another] claimed title to the premises, under a deed from James Dunning to them, dated June 1, 1800; and also a deed from Isaac Hatch and others to them, dated April 2, 1803. James Dunning, by his deed, in consideration of 2300 dollars, conveyed to the demandants a certain lot or tract of land, situate in Bangor, and bounded as follows: "Beginning on the bank of Penobscot river; thence running northwesterly by the northwest line of land owned by John Dennet, about one mile; thence southwesterly by the head line of the said John Dennet's land, and on the head line of Jacob Dennet's land, and William Hammond's land; thence continuing by said head lines until it comes to the southwest corner of land formerly taken up by James Dunning, deceased; thence northwest to the lot of land improved by William Holt, ten or eleven rods; thence northerly by said Holt's land one mile, to Kenduskeag stream; thence by the said stream, as the stream runs, until it comes to the head line of the lot of land owned and improved by William Hammond; thence southwest by said Hammond's southeast line, as far as it extends; thence southeast, to carry the whole width of the lot of land, until it reaches Kenduskeag stream; thence by said stream to the first-mentioned bounds; the whole containing two hundred and twenty-five acres, more or less, of which only five eighth-parts in common and undivided is the property of the above-named James Dunning (the gran-

tor), and is conveyed as above said, with the exceptions of about ten acres of land conveyed by deed to William Hammond, which deed bears date June 21, 1798, and entered upon the records of the said county of Hancock, &c., &c.; and also one acre conveyed by deed to Rice, which deed is also upon record, &c., and also a strip of land on which stands a store, lately improved by Benning Pickering, containing about one eighth of an acre, with the store standing thereon; which exceptions are reserved out of the five eighths conveyed as aforesaid; the whole subject to such roads as are already laid out, together with all the buildings standing on the aforesaid premises." Then follows the habendum, conveying the said five eighth-parts of the land above described, with the exceptions above stated, to the demandants and their heirs, with covenants of general warranty. The title of James Dunning (the grantor), to the premises, was as follows: It was admitted, that the said James Dunning was one of seven children of James Dunning, deceased, who was a settler in Bangor, and entitled, by certain resolves of the legislature of Massachusetts hereinafter stated, to the whole tract described in the deed from J. Dunning to the demandants, and that J. Dunning was the eldest son, and entitled to a double share of his father's estate. The other three eighth-parts of the tract of land were conveyed by the heirs to James Dunning (the grantor), by the deed of Elijah Smith and others, to James Dunning, dated the 29th of December, 1793. The resolves of the legislature of Massachusetts, above referred to, are dated the 5th of March, 1801, and the 19th of June, 1801. By the former resolve, it was provided, "that all the settlers in the town of Bangor, or their legal representatives, who actually settled before the 1st of January, 1784, be entitled to a deed of their respective lots of one hundred acres each, by paying into the treasury of this commonwealth, eight dollars and forty-five cents." And by the latter resolve, John Reed and Peleg Coffin, were authorized to make the proper conveyances. Accordingly, by their deed of the 11th of November, 1801, referring to the said resolves, and acknowledging the receipt of the consideration money of $9.30, paid them by the heirs of James Dunning deceased, "who (they state) settled in said township, and made improvements therein, before the first day of January, 1784," they conveyed and relinquished to the said heirs of James Dunning, deceased, "all the right, title and interest of the said commonwealth, in and unto a lot of land lying in said Bangor, and numbered ten, as was surveyed by Park Holland, in the year 1801, bounded as follows, viz. beginning at a stake and stones, the corner of lot number seventy, and thence north forty-five degrees, west two hundred and ninety-two rods, to

a stake marked, thence west forty-five degrees west to the bank of the river to the corner of the lot number nine, thence upon the bank of the river to the first mentioned bounds, and containing one hundred acres, agreeably to the return made by the said Holland to the aforesaid agents, and his certificate to the said heirs." On the 5th of August, 1800, Andrew Dunning, one of the heirs of James Dunning, deceased, by his deed of that date, conveyed his one-eighth part of the tract of land above described, to Moses and Amos Patten; by a deed, dated the 4th of April, 1800, John Dunning (another of the heirs) conveyed his one-eighth part to Isaac Hatch. Vincent Dunning (the remaining heir) was a non compos; and was (as is asserted) then under the legal guardianship of Nathaniel Harlow. On the 2d of April, 1803, in pursuance of a division into lots, and a partition, which had been agreed to be made by the claimants under the heirs of James Dunning, deceased, and Nathaniel Harlow, guardian of Vincent Dunning, of the whole tract of land, according to a plan drafted, and in which the lots were laid down by Moses Hodsden, Jr., Hatch, and Moses and Amos Patten, and Nathaniel Harlow as guardian, by their deed of that date, released and quitclaimed to the demandants forty-two of the lots laid down on the plan of Moses Hodsden, Jr., on the 14th of May, 1801 (enumerating them by their numbers, and among others, number seventy-three), and certain other lots, also enumerated, laid down on the plan of Hodsden, on the 10th of January, 1803. It was admitted at the trial, that, at the time when the demandants received this deed from Hatch and others, they gave mutual releases to the grantors of the other lots included in Hodsden's plan; and that these deeds made the partition of the tract of land, to which the heirs of James Dunning, deceased, were entitled as above stated, complete, as far as the parties could lawfully make it. The acre which had been conveyed by James Dunning to Rice, in 1798, and was excepted from his deed to the demandants, was afterwards, in November, 1801, conveyed by Rice to Jonathan Hyde (the brother-in-law of the demandant, Thomas), under whom, by intermediate conveyances, the tenants claim. Number seventy-three on Hodsden's plan is the same land which was so conveyed by James Dunning to Rice, and by him to Hyde, and is commonly known as the Hyde acre. The demandants, by their writ, claimed title to the whole flats in front of the Hyde acre; and to the whole upland of the Hyde acre. But at the trial, they confined their claim of title to three eighths of the upland, and to the whole of the flats.

The demandants, by Messrs. Rogers and Sprague, their counsel at the trial, insisted: (1) That the conveyance of James Dunning to Rice, in 1798, being of undivided lands,

could only operate upon so much of the lands as should ultimately be assigned as his property therein. That he had at the time only five-eighths therein;[2] and that the demandants, by the partition of 1803, became entitled to the remaining three-eighths therein, having given an equivalent therefor, in their deed of release to the other lots in Hodsden's plan. (2) They insisted, that the Hyde acre was bounded by the bank of the river, and did not extend to the flats. (3) They insisted, upon the whole evidence in the case (which was very voluminous), that they had established their right to the premises, and their seisin thereof within twenty years; and at all events, their right to, and seisin of the flats.

On the other hand, the tenant [Thomas F. Hatch], by his counsel, Messrs. Godfrey and Appleton, insisted: (1) That the demandant had not had any seisin of the upland, or of the flats, within twenty years. (2) That Rice purchased the whole acre of James Dunning, in 1798, and went into seisin and possession, claiming the whole acre, and those, who claim under him, have ever since remained in sole seisin and possession of the whole acre, claiming the flats also. (3) That the demandants had made out no title to the upland, or to the flats. That, at the time of the deed of partition, in 1803, Hyde was in sole seisin, and the deed could not operate to convey the three-eighths; for the heirs were then disseised. As to the flats, the deed of the commonwealth of Massachusetts never intended to convey them. The boundaries were, "upon the bank of the river." The deed from James Dunning to the demandants, in 1800, did not convey the flats; for he was a mere intruder upon the commonwealth; and had no seisin, by which he could convey. The deed of partition of 1803, never meant to convey the flats at all. The lots are bounded on the plan by the bank of the river.

STORY, Circuit Justice, in summing up to the jury, went into a full examination of all the evidence, and of the points made by the parties. But such portions only of the summing up are thought necessary to be stated, which more immediately respect the points of law raised at the trial. After having given a general outline of the case, and stating that the district judge concurred in the views which he was about to expound, the judge proceeded as follows:

In the first place, it is proper to consider what is the true construction of the deed from Dunning to the demandants, of the 1st of June, 1800. It conveys five eighth-parts of the whole tract, with the exception of the

---

[2] See on this point as to the effect of a deed of an entirety of a part of the lands by one tenant in common. Bartlet v. Harlow, 12 Mass. 348; Varnum v. Abbot, Id. 474.

ten acres conveyed to Hammond, the one acre conveyed to Rice, and the strip of land then occupied by Pickering. The deed conveys nothing whatsoever in the excepted parcels. Under that deed, therefore, the demandants took nothing in the Rice lot, now more familiarly known as the Hyde lot.

I am aware that a construction somewhat different from what has been above stated, has been given to this same deed by the supreme court of this state, in the MS. case which has been cited at the bar. If this were a question of purely local law, we should not hesitate to follow the decision of that learned court, for which we entertain the greatest respect. But the interpretation of a deed of this sort is in no just sense a part of the local law. It must be interpreted everywhere in the same manner; that is to say, according to the force of the language used by the grantor, and the apparent intentions of the parties deducible therefrom. The construction given by the state court is, in effect, this: That the deed does not convey the whole five eighths belonging to the grantor in all the tract of land, excepting the excepted parcels; but only so much as would remain of the said five eighths, after satisfying the claims of his co-tenants for their three eighths conveyed by him in the excepted parcels. The language of the court, in their opinion, is: "The parcels sold (by the grantor), being reserved out of the five-eighths, the residue was conveyed to the petitioners, (the demandants). He (the grantor) had given deeds of warranty to his prior grantees, and in selling the residue he meant to make provisions, that they should not be disturbed. In order to carry into effect the plain intent of the parties, it must have been contemplated, that in any partition, which might be made, the parcels excepted would be assigned as part of the five-eighths; and that the petitioners (the demandants), and whoever might claim under them, would be entitled to the residue of that proportion of interest to be set off to them in severalty. The petitioners (the demandants) did not purchase five-eighths; but they purchased such fractional parts of the whole, as would remain after deducting from five-eighths the parcels before sold." Now, whatever equity there might be in such an arrangement, and however proper it might be (if it existed) to be carried into full effect by the state court, on a petition for partition, to which the prior grantees might all be parties, I do not well see, that it would be conclusive upon the merits of the present controversy. But with the greatest deference for the learned state court, I feel myself bound to say, that I cannot adopt the interpretation thus put upon the terms of the deed. I find no sufficient warrant for it in the language and purport of that instrument. The granting part of the deed, commonly called the prem-

ises, conveys "a certain lot or tract of land, situate," &c., describing it by metes and bounds; and then adds: "The whole containing two hundred and twenty-five acres, more or less, of which only five-eighths, common and undivided, is the property of the abovenamed James Dunning (the grantor), and is hereby conveyed as abovesaid, with the exceptions of about ten acres of land conveyed by deed to William Hammond, &c. &c., and also one acre conveyed by deed to Rice, &c. &c.; and also a strip of land, on which stands a store, &c., containing one-eighth of an acre, &c.; which exceptions are reserved out of the five eighths, as aforesaid." Now, however inartificially the deed may be drawn in its form and language, I cannot but think it clear, that its true meaning is, that the grantor conveyed five undivided eighth-parts of the whole tract, except the ten acres, the one acre, and the strip of land above mentioned. In the excepted parcels he conveyed nothing; in the remainder of the tract he conveyed five eighths, to which it is clear he then claimed title. The words, "which exceptions are reserved out of the five eighths conveyed as aforesaid," have a natural reference to the preceding descriptive words of the deed, giving the boundaries of the whole tract, five eighths of which would, but for the exceptions, have been conveyed; and these words show that the five eighths of the excepted parcels are not granted. Upon any other interpretation, it is difficult to perceive what portion of the whole tract is conveyed. It would clearly not be five eighths, but five eighths minus some possible, indefinite, unascertained deduction, if one may so say, for owelty of partition, in some future division of the entire tract among all the parties, who were, or might become, entitled thereto. It appears to me that there is no such qualification in the deed. Five eighths and no less of the tract are conveyed in all the land, within the scope of the conveyance.

In the next place, did this deed, in 1800, to the demandants, convey the land only to the bank of the river; or did it convey the flats also, supposing the grantor capable of conveying the same? The descriptive words, so far as respects this point of the boundary are, "to Kenduskeag stream, thence by the said stream, as the stream runs, until it comes to the head line of the lot of land owned and improved by William Hammond." I consider the law to be clearly settled, that a boundary on a stream, or by a stream, or to a stream, includes the flats, at least to low-water-mark, and in many cases to the middle thread of the river. It may be different where the boundary is, "to the bank," or "by the bank," or "on the bank" of a river, or "to or by a monument on the bank;" for in such cases the boundary is, or may be limited to the very bank, and may not extend into the stream,

or the flats thereof.[3] The case of Lapish v. Bangor Bank, 8 Greenl. 85, is entirely conclusive on the point, that a boundary on a stream includes the flats.

If this be, as I am clear it is, the true construction of the deed; then the next inquiry is, whether the deed of 1803 was good to pass the title of Vincent Dunning, the non compos. It was in fact, and so, in contemplation of law, it is to be deemed, a partition deed between tenants in common. Harlow assumed to act, and to pass the title as guardian, receiving an equivalent release for the non compos in the other lots. Now, I am prepared to say, that, where a partition deed is made by tenants in common, and one of the tenants is under guardianship, the deed of partition, when executed by the guardian, is good to pass the title of the ward, at least until it is avoided by the non compos, or those claiming in privity of estate under him. The present deed has never been avoided by any person claiming under the non compos; and, therefore, I think, that, at least as to strangers to that title, in a case of partition, it is to be taken to be good. But then it is urged, that there is no direct proof, that Harlow was at the time the lawfully appointed guardian of the non compos. It is true, that no commission is produced, or can now be found on the probate records. But other papers are produced from the probate records, which show, that he was treated by the probate court as the lawful and regular guardian. Thus, the court received an inventory of the estate of the non compos from him as guardian in 1792; and as long ago as 1808, it settled and allowed an account with him as guardian. Under such circumstances, there is certainly strong primâ facie evidence, after such a lapse of time, to supply the direct proof of a probate appointment; and we all know how loosely, in those times, the records of the court of probate were in many cases kept.

Then, what does the deed of 1803 purport to convey? Does it convey the title of the grantors to the upland only, or to the flats also? I am of opinion that it conveys the title to the latter, as well as the former, in regard to lot number seventy-three. The deed refers to the plan of Hodsden, and it conveys the lots "as laid down on (the) plan drafted by Moses Hodsden, Jr., on the 14th of May, 1801." By necessary implication the plan is made a part of the description, and must supply any defects of the other specifications, in the same way as if it were annexed to, and made part of, the deed. This

is the clear doctrine in the case of Lunt v. Holland, 14 Mass. 149. Now, by reference to the plan, it is plain, that there are no descriptive lines or monuments on it in this part; but that the boundaries of the lots are on the stream of the river, and not short of it. And it must be presumed, that the parties intended a full and complete partition of the whole tract, and of all their interest therein, unless some other inference is to be deduced from the words of the conveyances. None such is pretended. But then it is suggested, that at the time of this conveyance, in 1803, the grantors were not seized of the Hyde acre, or any part thereof, and therefore were incompetent to convey it. Whether they were so seized or not is a matter of fact, upon which the jury must pass judgment. If they were not so seized, then it is clear, that so far the deed is rendered inoperative. As to the flats, I am not aware, that, at this time, there is any pretence to say, that Hyde was in seisin thereof, in virtue of his title to the acre purchased by him of Rice. The deed to him and to Rice did not extend, as I shall have occasion, presently, more fully to consider, beyond the bank of the river, so as to cover the flats. And no open visible possession of the flats, as far as I recollect, is shown, or attempted to be shown, in Hyde at this period. Then, as to the upland. It is clear, that the grantors were entitled, in 1803, to three eighth parts of the whole tract, including the Hyde acre, as tenants in common. It does not appear, that there was any open disseisin or adverse possession of any part of the tract against them; and indeed, there is strong evidence the other way. The one acre does not appear to have been enclosed by any fence from the other part of the tract, or in any other manner to have been in the visible and exclusive possession of Rice or Hyde. Now, it is clear, that under such circumstances, where there is no visible adverse seisin or possession of a part of a tract, an entry by any co-tenants on the tract gives a seisin of the whole, according to their titles; because the tract is not severed or divided by any visible bounds, or enclosure, or adverse seisin; and the entry must enure as a seisin of all the co-tenants, and for their benefit. But I shall leave it to the jury to say, whether, under the circumstances, there was any such open, visible, and exclusive possession of the one acre in Hyde, at the time of the partition deed of 1803, as amounted to, and was a disseisin of his co-tenants. If not, then this objection is overcome.

In the next place, as to the construction of the deed of the commonwealth of Massachusetts to the heirs of James Dunning, in 1802. It is said, that that deed conveys the tract of land only to the bank of the river, and thence upon the bank of the river; and that this excludes the flats from the grant. But it is to be remarked, that this is not the

---

[3] See Storer v. Freeman, 6 Mass. 435; Hatch v. Dwight, 17 Mass. 289; Hasty v. Johnson, 3 Greenl. 282; Dunlap v. Stetson [Case No. 4,164]; King v. King, 7 Mass. 496; Lunt v. Holland, 14 Mass. 149; Morrison v. Keen, 3 Greenl. 474; Graves v. Fisher, 5 Greenl. 69; Lapish v. Bangor Bank, 8 Greenl. 85.

whole description; for the deed conveys all the right, title, and interest of the commonwealth "unto a lot of land. numbered ten, as was surveyed by Pa?k Holland. in the year 1801." Now, if, by that plan, the lot is bounded on the river, and has no other specific boundaries marked than the river, it might deserve consideration, whether, taking the plan and the deed together, the commonwealth did not mean to convey the flats, as passing by operation of law with the upland. Such a construction has been adopted on some occasions by the supreme court of the state of Massachusetts and of Maine, in furtherance of the apparent intent of the legislature.[4] But be this as it may, it is clear that, as to all persons but the commonwealth, the demandants were capable of a sole seisin in the flats, in virtue of the conveyances to them. For, though the commonwealth cannot be disseised, and persons entering upon lands held by the commonwealth are to be deemed mere intruders, yet, as against all other persons, the entry will give a seisin capable of sustaining a writ of right. If, therefore, the demandants did, in virtue of the deeds to them, acquire a seisin of the flats, although they might be ousted by the paramount title of the commonwealth, .yet, until such ouster, they were to be deemed as having a rightful seisin against third persons.

The next question which arises is, whether the demandants have been in seisin of the premises, either of the upland or of the flats, or of both, within the prescriptive period of twenty years. If they have shown a seisin, that seisin will be presumed to continue, until some adverse seisin or disseisin is shown. In cases of co-tenants, a disseisin is not to be presumed; but it is to be established by competent proofs of an exclusive adverse seisin; for, ordinarily, the possession and seisin of one co-tenant is deemed the possession and seisin of all. I shall first consider the evidence of seisin as to the flats, and next as to the upland. But, before I proceed to the consideration of the evidence, as to the seisin, it seems necessary to examine the title of the tenants to the Hyde acre; and to. ascertain, whether, upon the true construction of the deed of Dunning to Rice. in 1798, any thing more than the upland passed, or was intended to pass by that deed; for it may have a most important bearing on the case, whether that deed was limited to the bank of the river, or by construction of law, included the flats in front of the upland. The boundaries in that deed are as follows: "A certain piece of land situate in Bangor, aforesaid, being and lying on the south side of Kenduskeag stream, butted and bounded

as follows, viz. beginning at a pine stump on the bank of said stream, and running northwest 2° north on the line of land belonging to William Hammond, twenty rods to a stake and stones, thence south 43° west 8 rods to a stake and stones, thence southeast 2° east to a rock on the bank of said stream, thence on the bank of said stream to where it first began, together with all the fishing privileges, contagious (contiguous), and belonging to the same, with all the privileges and appurtenances thereunto belonging, being one acre, be the same more or less." Now. it is apparent from the language of this deed, that it bounds the grant by known monuments on the bank of the stream, a pine stump at one end, and a rock at the other. And, upon the known principles of law, a boundary on the bank or by the bank, referring to fixed monuments on the bank, of a stream, limits the grant to the bank, and excludes the flats below the bank. Therefore, I am of opinion, that, upon the true interpretation of this deed, the land conveyed therein is bounded by the bank of the river, and does not extend or cover the flats. The subsequent conveyance by Rice to Hyde, in November, 1801. is a mere quitclaim of all Rice's title to the same land, as is the subsequent deed of Rice to James B. Fiske, in October, 1823, under whom the tenants claim. A constructive seizin of the flats by Rice or Hyde cannot, therefore, by the terms of the deed, be inferred in either of them; but it must be established by proofs of actual seizin. I do not enter into any examination of the general doctrine, what is the effect of a conveyance by one tenant in common of the entirety of one part of the lands held in common, upon the rights of the co-tenants. It is admitted, that it could not prejudice their rights; but could only apply, by way of estoppel, to so much of the land as might be assigned to the grantor, as his purparty in the land so conveyed upon a partition. See Varnum v. Abbot, 12 Mass. 474.

Let us then proceed to the consideration of the evidence as applicable to the point of actual seizin. (Here STORY. Circuit Justice, went into an examination of all the evidence applicable to the seizin of the flats and also of the upland. He concluded by leaving the question of seizin as to the flats, and also to the upland, to the jury upon the whole of the evidence, and stating that the district judge concurred in the views of the law and facts which he had expressed.)

The jury found a verdict for the tenants.

A motion was afterwards made for a new trial, by .the demandants. upon various grounds: (1) That the verdict was against the charge of the court in matters of law. (2) That it was against evidence and the weight of evidence. (3) That certain documents had been improperly admitted by the court as evidence; viz. a deed from Jere-

---

[4] See Lunt v. Holland, 14 Mass. 139, and Lapish v. Bangor Bank, 8 Greenl. 85. The latter is directly in point on the very resolve of March. 1801. respecting the Bangor settlers. See, also, Knox v. Pickering, 7 Greenl. 106.

miah Dudley to the demandant Thomas, and the record of a petition for partition in the case of James Thomas and Jeremiah Dudley against persons unknown, including the premises demanded. (4) That William Emerson was improperly admitted as a witness. The motion was accordingly argued at the October term, 1837, very elaborately, by Messrs. Rogers and Sprague for demandants, and by Messrs. Godfrey and Appleton for tenants, upon most of the grounds, upon which the same points had been argued at the trial, so far as matters of law were concerned. The court held the cause under advisement nisi; and afterwards their opinion was shortly delivered, as follows, at May term, 1838:

STORY, Circuit Justice. We have considered this cause with great deliberation, and remain of the same opinion, which we entertained after the argument upon the motion for a new trial. We are of opinion, that there must be a new trial. As the facts are again to be submitted to a jury, we do not wish to prejudice the cause by an elaborate examination of the evidence applicable to the points made at the bar. Our opinion proceeds upon this short ground, that in every view of the evidence properly applicable to the flats, whatever might be the case as to the upland, the verdict of the jury could scarcely have been for the tenants, without either disregarding the instructions of the court in point of law, or giving an effect to the evidence, which, in a just and legal sense, was not justified by it. New trial awarded.

A new trial was afterwards had, and a verdict found for the demandants. A motion was then made for a new trial; but the cause was afterwards compromised between the parties, one of the demandants and one of the tenants having died pendente lite.