## HOWARD *vs.* INGERSOLL.

1. An action to recover damages for overflowing a mill is local, and must be instituted in a court of the State in which the property is situated.
2. The *bank* of a river is that space of rising ground above low water mark, which is usually covered by high water, and the term, when used to designate a precise line, is vague and indefinite.
3. Where terms, used in a treaty or compact between States or Nations, are vague and indefinite, the nature of the thing to which they relate should be looked to to ascertain what was intended, and such construc-

tion should be placed upon them as will accord with reason, and, without injury to either, subserve the convenience of both the contracting parties.

4. Construing the articles of Cession, entered into on the 24th of April 1802 between The State of Georgia and The United States, according to the intention of the parties, *low water mark* on the we-t side of the Chattahoochie river, from the point at which it enters the present State of Florida to "the great bend" next above the place where the Uchee creek empties into said river, is the line of separation between the States of Georgia and Alabama.

5. The right of a person to the enjoyment of a water privilege, of which he is in the quiet use or possession, cannot be questioned by one who shows no adverse claim.

Error to the Circuit Court of Russell. Tried before the Hon. John J. Woodward.

THE defendant brought his action against the plaintiff in error to recover damages for overflowing his mill. The mill stands on the west side of the Chattahoochie river above low water, but below high water mark, and is supplied with water by means of a dam that runs in a north-east direction into the river, and which dam diverts a portion of the water to the mill. The water thus diverted returns into the river some distance above the dam erected by the plaintiff in error. The defendant in error erected this mill and dam, prior to 1842, and had been in the use and enjoyment of both, and of the water diverted by the dam, for several years before the act complained of. In 1845 the plaintiff in error erected a dam across the river, about three hundred yards below the mill, which backed the water upon, and overflowed it, at ordinary low water, without any increase, however, of the overflow when the river was full. The plaintiff in error relied for his defence on the articles of cession of 1802 between The State of Georgia and The United States, the material part of which is fully set out in the opinion of the court, a grant from said State to the City of Columbus, conveying the right to lay off lots on her river boundary, running across the river to high water mark on the west side, and a deed from said city, conveying to him said lots, and authorizing him to erect the dam complained of. It does not appear from any of the documentary or other evidence introduced on the trial, that the mill of the defendant in error is situated opposite the

river boundary of the City of Columbus. If more of the facts should be found necessary for a full understanding of the opinion, they will be found incorporated in it. The court charged the jury, in substance, that ordinary low water mark on the western side of the Chattahoochie river is the boundary line between the States of Georgia and Alabama, and that if the mill of the plaintiff was west of that line and had been overflowed by means of the dam erected by the defendant, he was entitled to recover. The defendant requested the court to charge the jury that when the river is at ordinary low water, the plaintiff has no right to the use of the water, which charge the court refused. To the charge given and to the refusal to charge as asked the defendant excepted and now assigns them as error.

CAMPBELL, with whom was HEYDENFELDT, for the plaintiff:

1. The plaintiff in his declaration avers that his land lies in the county of Russell and sustained injury in that county. This averment is material and must be proven as laid or the plaintiff must fail. An action upon the case for a nuisance to real property is local and must be brought in the courts of the country where the injury was done.—1 Chitty Plead. 268; Story's Confl. Laws, chap. 14, §§ 552, 554; 4 Term Rep. 503; 15 Mass. 280; 23 Wend. 484.

2. The question then arises, was the nuisance complained of done to property situated in the State of Alabama? Georgia, having the sovereignty and soil of the territory of Alabama, cedes to the U. States the "jurisdiction and soil of the lands situated within the boundaries of the United States, south of the State of Tennessee, *and west of a line* beginning on the western bank of the Chattahoochie river, where the same crosses the boundary line between the United States and Spain; running thence, *up the said river Chattahoochie,* and *along the western bank* thereof, to the great bend thereof," &c. The territory of the State of Alabama *lies west of the line laid down* in the article of cession. The line runs up the Chattahoochie river and *along the bank thereof.* The territory of Alabama then *is west* of a line that runs *along the bank of the river.* The eastern line of Russell county is the Georgia line.

The general law upon the construction of boundaries between nations, is laid down with great clearness by a French jurist,

who has written upon commercial and international law.   He says, "Arms of the sea and navigable rivers belong to the people, who live upon their banks, who can regulate the navigation as it is consonant to their safety or interest, according to their respective interests.   When a territory is bounded by a river or arm of the sea—in other words, when a navigable stream is the boundary between two nations, the general and natural rule is, that the nations respectively are entitled to half the stream. In this case, the river falls under the jurisdiction of one or the other people, who are exclusively sovereign each upon the side that belongs to it, who ought therefore to understand one another upon the subject of the navigation, so that neither should be prejudiced.   But the rule, according to which the river which separates two States belongs to both, ceases, and the river belongs entirely to the one or the other, if either have an exclusive title or an adverse possession.   It is thus that a decree of the council of 22d January 1726, rendered at an epoch when the province of Avignon belonged to the Pope, determined that the Rhone, which formed the line of separation of the two territories, belonged entirely to France and that the Pope had no title to it.   In this case, and if the river belongs entirely to one of the two States, the State which is the proprietor has the exclusive jurisdiction over the river and regulates the navigation."--1 Masse Droit Comm. 118-119; Grotius on War and Peace, book 2, ch. 3, n. 18.

This statement *does not exhibit a rule* variant from what the court would have drawn from an examination of the *public act* we have refered to.   The court will examine and determine from a just construction of that act the lines which separate the two States.

We shall then inquire into the meaning of the term "bank" of the river.   The case of Morgan v. Livingston, 6 Martin, 19, furnishes the interpretation of this term.   " The bank of a river is defined to be that which contains the river in its utmost height."   " The bank is that space which the water covers when the river is highest in any season of the year."

The same court decides what is meant by a river.   " The levee, then, as well as the batture under the surface of the water, is a part of the bank, and the bank is a part of the river, which consists of three things—the water, the bed, and the

bank. If these two objects, the levee and the batture, form a part of the river, they do not exist beyond the river."

This opinion of the Supreme Court of Louisiana is fortified by the citations made by Mr. Jefferson in his pamphlet published on the Batture Controversy. He furnishes citations from the most eminent jurists of Europe, upon international and municipal law, definitions of the word "bank," as applied to a water course.—5 Am. Law Jour. 48. Mr. Livingston's criticism on this essay of Mr. Jefferson, and in which infinite talent is manifested, supports the conclusion which we ask the court to attain. 5 Amer. Law Journal, 201. The arbiter between these able jurists, we have already cited. Chief Justice Martin was qualified to decide between them.

We return now to the examination of the point, was the mill of the defendant within the limits of Alabama? The place on which the plaintiff's (Ingersoll's) mill was situated was covered with water in ordinary high water, but was bare and dry in ordinary low water. The act of the defendant (Howard) was confined in its operation to the preservation of the water of the river within its ordinary high water level. Can the court of Russell county grant relief in such a case? Was the act a violation of any law of Alabama or right protected by Alabama? Was not the act done within the limits of Georgia? The Alabama territory then is west of the line which runs *along the bank and up the river*. The term, "*up the river*," indicates the direction of the line from the point of beginning; the term, along the bank, shows the location. It is apparent that the river was retained by the State of Georgia. The river is that portion of land contained within banks. The banks commence at the ordinary or extreme high water mark. That portion of land which is covered by the water in its natural stages is not called the bank. These authorities, which establish the law as it exists throughout Europe, have received confirmation from decisions in the United States. The decision in 5 Wheat., when the facts are examined fully, sustains our position. The cession of Virginia was of the territory north-west of the Ohio river. The river by the express terms of the article of cession was made the boundary, and the court decided that what was from time to time the river line constituted the boundary. The cession of Georgia to the United States does not constitute the river Chattahoochie

as the boundary. The territory she cedes is west of a line to be marked on the bank of the river. The waters of the river do not furnish the line, but the line agreed to is a permanent line running along the bank. This point has been discussed in a number of cases, which I propose now to cite. Some of these are found in the brief of Judge Berrien, and my purpose is not to refer to the decisions produced by him, but to refer to such others as are pertinent to the case.

The question came up in 3 Sumner, 171. The head-note is, "A boundary on the bank of a stream, refering to fixed monuments on the bank, limits the grant to the bank, and excludes the flats." Judge Story says, "A boundary on a stream, or by a stream, or to a stream, includes the flats at least to low water mark, and in many cases to the middle thread of the river. It may be different when the boundary is to the bank, or by the bank, or to or by a monument on the bank, for in such cases the boundary is, or may be limited to the very bank, and may not extend into the stream or the flats thereof." The cases cited from the Massachusetts Reports are relied on, and the following case from Greenleaf sustains the proposition:—2 Greenl. 213; 4 Mason, 366. The proposition that the boundary is *permanent* and not subject to changes by the changes of the river, is directly determined in the case of *Doe ex dem.* Lynch v. Allen, 4 Dev. & Batt. 62. A similar proposition came before the court of New York. The case is reported in 20 Wend. 149, and the judgment of the court was reversed in 4 Hill, 369. In the Appellate Court, the dissenting opinion was taken for the correct exposition of the law. The deed there called for the river as a beginning, and the line run *thence along the shore* to a point. The court upon the most substantial reasons, found in the opinion of the Chief Justice, (Bronson,) decided that the river was excluded. The beginning point in the Georgia grant is not the river. The State of Georgia cedes *west* of a line *beginning on the western bank* where *the same* crosses the boundary line between the United States and Spain. The direction is then up the river, but follows the line of the bank to a fixed and determinate natural object—viz, the great bend of the river. So that the question comes back, what is the bank? Where does it commence?—where terminate? Can that be called a *bank* with any propriety, which is covered during the whole

period when the river is required for the purposes of navigation? 17 Wend. 599; 1 Pet. C. C. R. 64; 20 Wend. 164.

The next inquiry will be whether the court erred in refusing the charge asked for by the defendant's counsel? The gravamen of the action is not the injury done to the plaintiff's land, but injury to an appurtenance or privilege attached to the land. The declaration charges that the plaintiff was seized of certain lands and was entitled to the use of the river Chattahoochie and its waters, and that the obstruction of these waters impaired his mill privilege. The material inquiry then in this case is has the defendant shown that he had a title to this easement? Could he take from the State of Georgia waters to supply his mill? If the State of Georgia grants a mill privilege below, is the defendant authorised to complain of such a use of the waters as affects an easement above, to which he has no title? The State of Georgia does not complain of the *dam* erected by the plaintiff. The damages claimed by the plaintiff is for a mill privilege which he charges was injured. The charge asks that the court should say no such privilege attached to the land. This question seems to have been directly decided.—4 East. 108.

BELSER, with whom was RICE, for the defendant:

1. By the common law, which does not prevail in Alabama, but which is in full force in Georgia, riparian proprietors on the Chattahoochie river own to the centre of the stream.—Bullock v. Wilson, 2 Porter, 445; Mayor of Mobile v. Eslava, 9 ib. 577; 4 Kelly & Cobb (Ga.) 241; 2 N. Hamp. 369; 2 Conn. 481; 6 Hum. 365; 16 Ohio, 540; 26 Wend. 404; 3 Caines, 319.

2. To limit this ownership either as to the bed of the stream, or the use of the water flowing through it, both must be distinctly excepted in the grant, and if left doubtful, the grantee takes.—3 Smede & Marsh. 403; 1 Ran. 420; 17 Pick. 42; 8 Watts & Ser. 436; 13 Conn. 26; 11 Conn. 82; 3 Scam. 510; 10 N. Hamp. 305; Vattel's Law of Nat. 120; Handy's Lessee v. Anthony, 5 Wheat. 379; 4 Mason, 365; 3 Sumn. 183; 9 Ohio, 13; Peters C. C. Rep. 64; 6 Mass. 435; 17 Mass. 289; 4 Hill, 369; Angel on Watercourses, p. 7, 8; Ex parte Jennings, 6 Cow. 549.

3. The sea shore, or bank of a river, where the tide ebbs and flows, is all the ground between high water mark and low water

mark; or the margin of the sea, in its usual and ordinary state. Angel on Tide Waters, p. 64-5-6-7-8; Storer v. Freeman, 6 Mass. 439; Child v. Starr, 4 Hill, 375; Mayor of Mobile v. Eslava, 9 Port. 597. The shore or bank in dispute is that portion of the soil which touches the margin or edges of the water of the stream.—Starr et al. v. Child, 20 Wend. 152; Child et al. v. Starr et al. 4 Hill, 375-6; Handy's Lessee v. Anthony, 5 Wheat. 385. And there is a distinction on this point between the civil and common law.—Ex parte Jennings, 6 Cow. 549; 3 Smede & Mar. 395 to 403.

4. The terms of the grant, the circumstances attending it, and the mention of the *natural* boundary in the cession, authorise Ingersoll to hold the soil of the stream to the centre of it, if it still remains under the common law.—5 Paige, 137; 1 Rand. 417-420; 6 Cow. 518; 2 McMullen, 44; 3 Dev. & Batt. 63; 5 Watts, 458; 24 Wend. 451; 2 Ohio, 425; 11 Conn. 60; 7 Wheat. 7; 1 Hayw. 258; 2 ib. 382; 20 Wend. 156.

5. He can at least hold the flats on the western side of the Chattahoochie river, where his land lies, between high and low water mark, and use the water as it flows, even if the grant gives to Georgia the *soil* in the bed of the stream. There is certainly no exception as to the *usufruct,* and the case stands precisely as if the *river* belonged to the public and *the banks of it* to Ingersoll.—2 Port. 436; 3 Ohio, 496; 3 Dev. 59; 4 Hill, 369; 6 Hum. 368; 5 Wheat. 375; 11 Ohio, 143-4; 4 Miss. 346 to 349; 8 Watts & Ser. 436; 22 Wend. 425; 3 Scam. 521. And it should be observed, that in many of the foregoing decisions the *ad filum aquæ* was not alluded to, *because the soil of the river had been reserved.*

6. But, aside from this, Ingersoll is not shown in any manner to be a trespasser on the rights of Georgia, or those of the plaintiff in error.—Pier v. State, 12 Ala. 149; Knapp v. Mc-Bryde, 7 ib. 20.

DARGAN, C. J.—The principal, if not the only question in this case, is whether the mill, for the overflowing of which the suit is brought, is situated within the limits of the State of Alabama? If it is, the plaintiff has shown title to the land on which the mill is erected, and the suit is properly brought in the courts of this State. If, however, the mill is not situated within the limits of

this State, then no suit can be brought in our courts to recover damages for the injury done to it, whether the plaintiff has title to the land or not; for the action is local in its character and can be brought only in the State in which the property is situated. The law is well settled that all actions or suits to recover land, or to recover damages for injuries done to land, or real property, must be brought in the courts of the country in which the land is situated.—See Story's Confl. of Laws, § 554, and the cases there cited.

We must then ascertain whether the land on which the mill is erected lies within this State, or whether it is within the State of Georgia. For this purpose we must first look to the articles of cession between the State of Georgia and the United States, entered into on the 24th day of April 1802, by which Georgia ceded to the United States the territory that now forms that portion of the States of Alabama and Mississippi, north of the 31st degree, north latitude. From these articles or deed of cession we must ascertain the line that separates the jurisdiction of the State of Alabama from the State of Georgia, and then, looking at the evidence contained in the bill of exceptions, we can solve the question whether the mill is located within the limits of this State. The first article of the compact or deed of cession is in the following language: "the State of Georgia cedes to the United States all the right, title, and claim, which the said State has to the jurisdiction and soil of the lands, situated within the boundaries of the United States, south of the State of Tennessee, and west of a line beginning on the western bank of the Chattahoochie river, where the same crosses the boundary line between the United States and Spain, running thence up said river Chattahoochie, and along the western bank thereof, to the great bend next above the place, where a certain creek or river called the Uchee, (being the first considerable stream on the western side above the Cusseta and Coweta towns) empties into the said Chattahoochie river; thence in a direct line to Nickajack on the Tennessee river, &c." The line thus described forms the eastern boundary of the State of Alabama, and the western boundary of the State of Georgia. It begins on the western bank of the Chattahoochie river, where the same crosses the then boundary line between the United States and Spain, and runs up said river and along the bank thereof. From this language we must determine

the precise point that separates the two jurisdictions, the one from the other. The term bank of a river, to my mind, does not convey a definite and determinate idea of a fixed point of locality. For instance, when the water is low, should we say of one near its edge that he is standing on the bank of the river, the expression would not be inaccurate; if the water should afterwards rise and he should again be seen standing near its edge, we might, with equal propriety, say he is standing on the bank, although there might be a considerable distance between the two places, the one on which he is standing and that on which he had stood. In the case of Morgan v. Livingston et al. 6 Martin La. Rep. 19; Judge Martin defined the bank of a river thus: "it is that space which the water covers, when the river is highest at any season of the year;" of course he must have meant that space upon the rising ground above low water, but covered by high water, for he then proceeds to say that the river consists of three things, the water, the bed, and the banks, and he could not have intended to include in the definition of the term bank, the bed of the river. The bank of a river may be said to be that space of rising ground above low water mark, which is usually covered by ordinary high water. We cannot conceive of any other definition more accurate than this; for the rising ground above low water cannot with any propriety be said to be the bed of the river, and therefore it must be the bank. We then see that the term bank of a river is an imperfect, or rather an indefinite guide, when we seek by it to fix upon a precise point of locality; for the bank of a river extends, or may extend, over a considerable space; in this respect, therefore, the term is indefinite and indeterminate. We know that the precise line that divides the two jurisdictions must be fixed on the bank of the river, but this bank extends from usual low water to usual high water mark.

In all compacts or treaties between States or Nations, the intention of the parties must be our guide in determining any question in reference to them. If that intention is clear and plain there is no room for comment, nor necessity for construction, for the intention of the parties being clear, the rule by which the court is to judge is clear. But if the terms or expressions used by the contracting parties are vague or indefinite, or if they are susceptible of a more or less extended signification, we must then

look to the nature of the things to which these terms relate, and presume the intention of the parties to be in accordance with reason. This is one of the rules laid down by Vattel, for the construction of treaties, (see pages 263, 264,) and it may be added, that if such a construction can be given to such indefinite expressions as will serve the convenience of both the contracting parties, without injury to either, this is the rule we should adopt, for it would be but reasonable to presume that such was the intention of the parties. Let us apply the rule of construction to the compact between the United States and the State of Georgia. No benefit could have been anticipated by the State of Georgia in reserving to herself the narrow strip of land between high and low water mark on the west side of the Chattahoochie, nor do we see that any could result from such reservation; but, on the contrary, inconvenience both to Georgia and to Alabama, must arise, if this strip of land is retained by Georgia within her limits. She must then take cognizance of and punish all offences committed within that space, although done by our own citizens. This would be a matter of inconvenience to both States, and possibly might become a source of jealousy and complaint. No good could result to either State from it, but inconvenience to both. We should presume that these things were present to the minds of the contracting parties, and that they did not intend by the use of this term to fix upon a line inconvenient to both, when the same term is not only sufficient, but as well designates a line of convenience, as it could be made to designate one of inconvenience and injury. We think it clear that if the case is doubtful, we should hold the line to be at that point, which would promote the convenience of both States, and prevent the unkind or unfriendly feeling, that might grow out of, or be engendered by the exercise of jurisdiction, on the part of Georgia, over this strip of land on the west side of the Chattahoochie, which at some places must be wider than at others, and the precise limit of which, not unfrequently, it might be difficult, if not impracticable to ascertain. Low water mark is then the line that convenience designates, and the terms used by the contracting parties are as well calculated to induce us to believe that they intended this point as the line, as any other that can be embraced within the legitimate meaning of the term bank.

In the case of Handy's Lessees v. Anthony, 5 Wheat. 374,

the question was, to ascertain the line between the State of Virginia and the territory she had ceded to the United States. The words of the deed or grant were, "all her territory north west of the river Ohio." The word *river* was used to designate the line, and the Supreme Court held that low water mark was the line of eparation. Now if it be true, as held by the Supreme Court of Louisiana, and, indeed, by many civil law writers, that the term *river* includes the water, the bed over which it passes, and also the banks within which it is contained when the river is full, then the term *bank*, in the absence of other words denoting a different intent, would mean the same thing that the term *river* would signify, and in this view the case in Wheaton would be directly in point and conclusive of the question. But Judge Marshall, who delivered the opinion, did note that the word *river*, and not *bank*, was used; hence it is supposed, that if the term bank had been used instead of the term river, the court would not have held low water mark to be the line. But I think all must admit that the river is inseparably connected with the bank, even if the bank be not included within the legitimate meaning of the term river; and being thus connected, the bank begins where the water touches the land, and we can therefore keep within the legitimate meaning of the term bank, and fix the line at low water mark. Under this view all the argument of convenience, which seems to have influenced the court in the case refered to, would apply with the same force in the case before us, that it did in the case of Handy's Lessees v. Anthony. I do not think it necessary to examine the numerous decisions, with which our books abound, and to many of which we have been refered, for they are in reference to the rights of individual owners of the land adjacent to the river. It may, however, be safely said, that when a private grant is bounded by the bank or a running stream, in which the tide does not ebb and flow, no well considered case can be found, that limits the grant short of low water mark, unless there be other words or expressions used in the deed, showing that the parties did not intend that the grant should extend to low water mark. In the case of Child v. Starr, 4 Hill, 369, Chancellor Walworth said, "the shore of tide water is that portion of land alternately covered by water and left bare by the flux and reflux of the tide. Properly speaking, therefore, a river, in which the tide does not ebb and flow,

has no shore; it has *ripam*, but not *littus*. The term shores, however, when applied to such a river, means the river's banks above low water mark, or rather those portions of the banks of the river which touch the margin or edges of the water of the stream. A grant, therefore, that is bounded by the *shore* of a fresh water river, conveys the land to the water's edge, at low water." In the case of Hatch v. Dwight et al., 17 Mass. 289, Parker, C. J. said, "Without doubt, by our law, the owner of land extending to the bank of a river will own to the middle of the river, if it be not navigable, and public property; but the owner may sell the land without the privilege of the stream, as he will, if he bounds his grant by the bank." Now I admit, that if the grant be limited to the bank of the river, the land covered by the water will not pass by it, that is, the bed of the river will not be granted; but we consider it well settled, that if land be granted on a running stream, not navigable, and in which the tide does not ebb and flow, and the words used to designate the boundary be the river, or the bank of the river, then the grant will extend to the middle of the stream, unless there be some other expression used, or some other circumstance, showing that the parties did not intend that the grant should extend *ad filum aquæ*. This, we think, is the result of all the cases upon this subject—see them collected in Angell on Water Courses, p. 6 to 11. We have refered to the cases of private grants, for the purpose of showing that there is nothing in them that would forbid the idea that, by the term *bank*, as used in the articles of cession between the State of Georgia and the United States, any point short of low water mark was intended as the western boundary of the State of Georgia. We may therefore lawfully hold that low water mark on the west side of the Chattahoochie is the line that separates the jurisdiction of the State of Alabama from the State of Georgia. This is the line, we believe, that was intended to be established as the western limit of the State of Georgia by the compact between that State and the United States. Looking, then, to the evidence which shows the locality of the mill, it is clear that it is situated within the limits of this State; for although there are high bluffs on each side of the river where the mill is situated, and the mill is east of the bluff on the Alabama side, yet it is west of the ordinary low water mark, and the land on which it is erected is covered only

Howard v. Ingersoll.

by high water.   We therefore come to the conclusion, that the plaintiff has shown title to the land on which the mill is erected, and, as it is situated within the limits of this State, the plaintiff may sue here for an injury done to it.

We do not think it necessary to examine the question, whether the plaintiff, by virtue of his title to low water mark, can claim the usual water privileges.   He was in the quiet possession or use of the water, and had erected a dam into the stream, by means of which a portion of the water was diverted to his mill, but it united again with the river above the defendant's dam.   We could not, therefore, presume this use of the water tortious, unless the defendant had shown some adverse right to the water in himself at the point where it was used by the plaintiff.   If it were admitted that the plaintiff was not entitled to the water privileges, a stranger or one having no right to the water at this point could not be permitted to disturb him in the use of it, but the party entitled to the water privileges at this point of the river could alone question the plaintiff's right to use the water.   The defendant, it is true, introduced a deed from the corporate authorities of the city of Columbus, by which certain lots were conveyed to him.   This deed purports to grant the land across the river, to high water mark on the west side of the Chattahoochie, but, under the view we have taken, the western boundary of this grant must be low water, and not high water mark.   But we cannot discover from this deed, nor from anything stated in the bill of exceptions, that the defendant claims the land where the mill is situated, or the water at the point where it is used by the plaintiff.   If this deed does cover the bed of the river where the plaintiff uses the water, it is not shown by the bill of exceptions.   We must, therefore, consider the defendant as a stranger, without right to the water at the point where it is used by the plaintiff, and, consequently, he could not make up an issue with one who was in the possession or use of the water, nor contest his right to its use.

After the best examination we are able to give this case, we are satisfied that there is no error in the ruling of the court, and the judgment must be affirmed.