### St. Joseph & G. I. R. Co. *v.* Devereux, Sheriff.

*(Circuit Court, D. Kansas. December 30, 1889.)*

1. RAILROAD COMPANIES—TAXATION—BRIDGES.
    A railroad bridge, not constructed as a part of the road, and used for general purposes of travel, is subject to local taxation, and the return of the bridge to the railroad assessors of the state as a part of the road's mileage does not exempt it from such taxation as an independent structure.

2. STATES—BOUNDARY LINE BETWEEN KANSAS AND MISSOURI.
    The act of congress approved June 7, 1836, ceding to the state of Missouri the strip of land known as the "Platte Purchase," provided that "when the Indian title to all the lands lying between the state of Missouri and the Missouri river shall be extinguished, the jurisdiction over said lands shall be hereby ceded to the state of Missouri, and the western boundary of said state shall be then extended to the Missouri river," etc. *Held,* that by this act the western boundary of the state of Missouri was not fixed at the east bank of the river, but in the center of the channel of said river.

3. SAME—ACT OF CONGRESS.
    That act is to be regarded not only as a grant, but as an act of a competent authority establishing the boundary line of a state.

In Equity. Bill to enjoin collection of a tax.

*A. L. Williams,* for complainant.

*J. L. Gillpatrick,* for defendant.

BREWER, J. This is a bill, filed by complainant, to enjoin the collection of taxes on a bridge crossing the Missouri river at St. Joseph. The entire bridge was assessed by the county authorities of Doniphan county as being an independent structure, and wholly within the limits of the county. The bridge was built under a special charter, but afterwards became the property of the railroad company, the complainant. Complainant returned the bridge to the railroad assessors of the state as a part of its mileage, and without in any wise specifying that it was a bridge. It cost over half a million of dollars, is now worth over three hundred thousand, and is used not simply as a railroad bridge, but also

for general travel. It crosses the Missouri river from the city of St. Joseph, Mo., to the Kansas shore.

Two questions are presented: *First.* Is it wholly within the county of Doniphan? And that depends upon where the boundary line between the states of Kansas and Missouri is,—whether in the center of the main channel or on the east bank of the river. *Second.* Did the return of this as a part of the railroad track exempt it from taxation as an independent structure in Doniphan county?

With respect to the latter question there can be little doubt. The bridge was not constructed as a part of the railroad. It is a costly structure, used for purposes of general travel; and the fact that the railroad company has its rails upon and runs its cars across it does not destroy its original character as an independent structure. It is clearly subject to local taxation.

The first question is, however, one of difficulty. Historically, the original western boundary of the state of Missouri was defined by "a meridian line passing through the middle of the mouth of the Kansas river, where the same empties into the Missouri river; thence, from the point aforesaid, north, along the said meridian line, to the intersection of the parallel of latitude which passes through the rapids of the river Des Moines." Act of March 6, 1820. This left a narrow strip between such western boundary and the Missouri river. At the session of 1834–35, an amendment of the constitution of Missouri was adopted, section 4 of which reads as follows:

"Sec. 4. That the boundary of the state be so altered and extended as to include all that tract of land lying on the north side of the Missouri river, and west of the present boundary of this state, so that the same shall be bounded on the south by the middle of the main channel of the Missouri river, and on the north by the present northern boundary line of the state, as established by the constitution, when the same is continued in a right line to the west, or to include so much of said tract of land as congress may assent."

And by the act of congress approved June 7, 1836, this strip above mentioned, known as the "Platte Purchase," was ceded to the state of Missouri. The language of the act is as follows:

"Be it enacted by the senate and house of representatives of the United States of America, in congress assembled, that when the Indian title to all the lands lying between the state of Missouri and the Missouri river shall be extinguished, the jurisdiction over said lands shall be hereby ceded to the state of Missouri, and the western boundary of said state shall be then extended to the Missouri river, reserving to the United States the original right of soil in said lands, and of disposing of the same: provided, that this act shall not take effect until the president shall by proclamation declare that the Indian title to said lands has been extinguished; nor shall it take effect until the state of Missouri shall have assented to the provisions of this act." 5 St. U. S. 34.

Now, the contention is that by this act the western boundary was fixed at the east bank of the river. This, I think, is a mistake; and that the center of the channel is the boundary line, and the limit of the cession made by this act. It will be seen that the petition was for a tract bounded by the middle of the channel of the Missouri river, and the

grant of jurisdiction was over the lands "between" the old state line and the "Missouri river;" and this western boundary was "extended to the Missouri river," and this grant was made, and its boundary fixed, obviously, in response to the petition. Counsel for the defendant urge that this shall be taken as a grant from one proprietor to another, while to my mind it is to be regarded not only in the light of a grant, but also as an act, by competent authority, establishing the boundary line of a state, independent, in some respects, but within the general jurisdiction of the authority making the designation. It is true there is a cession of jurisdiction, and therefore something in the nature of a grant. So there is whenever any new state is carved out of the territories. The new political organization is granted jurisdiction over the prescribed territory; but, after all, the main idea is the governmental one, —the declaration of the boundaries of the new jurisdiction. It is true, here was a state already in existence, and jurisdiction over this territory was transferred to it; and therefore there is in it more of the nature of a grant; but, even in this case, it is also to be regarded as a governmental declaration of the boundary. It will be noticed that the cession is to the river, and not to the bank. The words are general. There are no special words of exception or limitation. In the case of *Jones* v. *Soulard*, 24 How. 41, the question was presented as to the eastern boundary of the corporate limits of the city of St. Louis. The calls for boundary in the charter were:

"Beginning at Antoine Roy's mill, on the bank of the Mississippi; thence running sixty arpens west; thence south, on said line of sixty arpens, in the rear, until the same comes to the Barrieu Donoyer; thence due south, until it comes to the Sugar Loaf; thence due east, to the Mississippi; from thence, by the Mississippi, to the place first mentioned."

And upon this the supreme court adjudged the boundary the center of the channel, saying, in the opinion:

"Many authorities resting on adjudged cases have been adduced to us in the printed argument presented by the counsel of the defendant in error, to show that from the days of Sir MATTHEW HALE to the present time all grants of land bounded by fresh-water rivers, where the expressions designating the water-line are general, confer the proprietorship on the grantee to the middle thread of the stream, and entitle him to the accretions. We think this, as a general rule, too well settled, as part of the American and English law of real property, to be open to discussion."

In the case of *Howard* v. *Ingersoll*, 13 How. 381, where the question was as to the boundary between the states of Alabama and Georgia, NELSON, J., in a separate opinion, thus states the law:

"Where land adjoining a fresh-water river or above tide-water is described as bounded by a monument, whether natural or artificial, such as a tree or a stake standing on the bank, and a course is given as running from it up or down the river to another monument standing upon the bank, these words necessarily imply as a general rule that the line is to follow the river according to its meanderings and turnings, and the grantee takes to the middle of the river. Such is the uniform construction given to this description, where the common law prevails. It has been repeatedly applied to grants abutting

on the river Mississippi, the Missouri, the Hudson, the Connecticut, and other great rivers in the United States above tide-water.  3 Kent, Comm. 427–429, and notes; Ang. Water-Courses, (Ed. 1850,) c. 1."

There can be no doubt as to the general doctrine; and the authorities cited in the briefs of counsel in 24 How., *supra*, show the application of that doctrine under a great variety of circumstances.  The case of *Howard* v. *Ingersoll, supra*, although locating the boundary line on the bank rather than in the middle of the Chattahoochee river, still recognizes the general doctrine, and rests upon the special language in the cession.  The language there was as follows:

"West of a line beginning on the western bank of the Chattahoochee river, where the same crosses the boundary line between the United States and Spain; running thence up the said river Chattahoochee, and along the western bank thereof."

And Justice WAYNE, in delivering the opinion of the court, thus noticed the general rule, and the reason of its non-application in this case:

"If the language of the article had been, ' beginning on the western bank of the Chattahoochee, and thence running up the river,' and no more had been said, the middle thread of the river, ordinarily, and without any reference to the fact that Georgia was the proprietor of the river, would have been said to be the dividing line between the two states.  But there is added: ' Running up the said river Chattahoochee, and along the western bank thereof.'  This last controls any uncertainty there may be; for, if the first call or object to locate the line is the bank of the river, it is plain that the western limit of Georgia, on and along the bank of the river, must be where the bank and the water meet in its bed, within the natural channel or passage of the river.  The words 'along the bank,' added to the words ' on the bank,' distinguish this case from all of those in which courts have had the greatest difficulty, where a line was to be fixed, when it is on the bank, without a call for the stream, or along the river, or up or down the river. * * * ' Along the bank ' is strong and definite enough to exclude the idea that any part of the river, or its bed, was not to be within the state of Georgia."

As against this general rule and these authorities, defendant relies largely on the case of *Handly's Lessee* v. *Anthony*, 5 Wheat. 375.  That case decided that—

"The boundary of the state of Kentucky  * * *  does not include a peninsula or island on the western or north-western bank, separated from the main-land by a channel or bayou, which is filled with water only when the river rises above its banks, and is at other times dry."

It seems to have been assumed that the northern bank of the Ohio river was the boundary of the state of Kentucky; and the question decided was where that northern bank was.  And yet there is, unquestionably, something in the opinion of the court which helps to sustain defendant's contention.  The territory north of the Ohio was ceded by Virginia to the general government, and the description was, the territory "situate, lying, and being to the north-west of the river Ohio;" and, in respect thereto, Chief Justice MARSHALL, speaking for the court, uses this language:

"When a great river is the boundary between two nations or states, if the original property is in neither, and there be no convention respecting it, each

holds to the middle of the stream. But when, as in this case, one state is the original proprietor, and grants the territory on one side only, it retains the river within its own domain, and the newly-created state extends to the river only. The river, however, is its boundary."

Counsel say that was a cession from a state to the general government; this, a cession from the general government to the state; that, a cession of all "north-west of the river;" this, of all between a fixed line and the river; and from this similarity insist that that case is decisive of this. That there is similarity, must be conceded; and yet there is the distinction suggested by me in the forepart of this opinion. One is only a cession,—a grant,—while the other is also a governmental designation of a boundary. Further, the language of the description is not identical. One is,—and this in that which is only a grant,—"territory north-west of the river;" and the chief justice holds that that grants nothing of the river; that the description is exclusive. At best, this is mere *dictum;* for the jurisdiction of Indiana was sustained over the tract in question. Here the cession was to land between the old state line and the river, and the extension of the boundary was to the river, thus making that natural water-course the boundary; and the general rules construing such words of cession, as subsequently affirmed by the supreme court in the cases cited *supra,* carry that boundary to the center of the channel. Beyond this are these minor considerations. In the case of *Missouri* v. *Iowa,* 7 How. 660, in which was decided a controversy between the two states as to their boundary, not involving the question here, the supreme court used this language in reference to this cession to the state of Missouri:

"In February, 1831, the state of Missouri, by a memorial from the legislature to congress, petitioned the United States for an addition of the country west of the line running from the mouth of the Kansas north, and between said line and the Missouri river, alleging that it was a small slip of land that had been acquired, by the treaty of June 3, 1825, from the Kansas Indians. The petition declared that the line from the mouth of the Kansas north was about one hundred miles long; that the country was settled, and rapidly settling, to its utmost verge; and that, as the Missouri river was the only great highway of this region, and could not be reached through a country inhabited by Indians, and being without roads, a cession of it to that state was necessary and proper. June 7, 1836, congress acceded to the request of Missouri, and granted to that state all jurisdiction over the lands lying between its then western line and the Missouri river; making the river the western boundary. But the accession was not to take effect until the Indian title to the country was extinguished."

Of course, this is no more authoritative than the *dictum* of Chief Justice MARSHALL; and yet it shows that the state of Missouri sought the only water-course as the highway of its western border, and that congress acceded to the request.

Again, in the act admitting the territory of Nebraska into the Union as a state, the description of its boundary seems to recognize the channel of the Missouri river as the north-west corner of the state of Missouri.

I need add nothing more to express the conclusions to which I have come. I think the center of the channel is the boundary line between

the two states. The assessment of the bridge by the county of Doniphan was excessive, but the agreed statement of facts shows the exact proportion that is west of the center of the channel. The decree will therefore be that, upon payment within 60 days by the complainant of that proportion of the entire tax which the length of that portion of the bridge in Kansas bears to the whole, an injunction will issue restraining the collection of the balance. Failing to make such payment, the suit will be dismissed.