(128 So. 158)

## ELMORE COUNTY v. TALLAPOOSA COUNTY.

### 5 Div. 21.

Supreme Court of Alabama.

January 16, 1930.

Rehearing Denied May 15, 1930.

Holley & Milner, of Wetumpka, and Martin, Thompson, Turner & McWhorter, of Birmingham, for appellant.

Jacob A. Walker, of Opelika, J. Sanford Mullins, of Alexander City, and Steiner, Crum & Weil, of Montgomery, for appellee.

THOMAS, J.

The bill to which demurrer was directed was by the county of Tallapoosa against the county of Elmore, and the same was filed in the circuit court of the former county. Its purpose was to establish and define the true boundary line at a certain and designated locality between the two counties. That

pleading sets forth and defines the line which appellee insists is. the true line.

It is also alleged in paragraph 11 of the bill "that from time immemorial, to wit: December 18, 1832, Tallapoosa County has been in possession of and exercised sovereignty, dominion and jurisdiction over the territory now in dispute between said Counties, as aforesaid, and that from and after February 15, 1866, the date when Elmore County was created, or attempted to be created, Tallapoosa County did, for a half century, and until recent date, exercise sovericgnty, dominion and jurisdiction over all of the territory in dispute between said Counties up to the West bank of the Tallapoosa River, and said West bank of said River has, during all of said years, been taken and accepted as the true boundary line between said Counties by the inhabitants of both Elmore and Tallapoosa Counties; and that Elmore County, in its corporate and political capacity, as well as the inhabitants of said County, during all of said years, and until recently, have recognized the West bank of the Tallapoosa River as the true boundary line between the said Counties, and said County of Elmore, and its inhabitants have, during said years, and until recently, acquiesced in the exercise of sovereignty, dominion and jurisdiction by Tallapoosa County over the territory now in dispute, up to the West bank of the Tallapoosa River."

Demurrer directed thereto raised the question of lack of jurisdiction, that of the venue of such action, and the corporate entity of the parties as affecting the right to be made parties to the suit; that is, the jurisdiction of the circuit court of Tallapoosa county is also challenged on the question of venue,—that only the court in the county of Elmore had the jurisdiction to hear and determine the controversy. From a decree overruling demurrer, defendant county of Elmore appealed.

It is averred that complainant is a body corporate duly organized and constituted, and exercising the function and jurisdiction of such body within the state under and by Act of the General Assembly approved December 18, 1832; and the county of Elmore was the result of the Act of the General Assembly approved February 15, 1866, page 484. It is further averred of the respective insistences of the two counties:

"Complainant shows unto Your Honor that the boundary line between it and the Respondent is in dispute, Complainant claiming its Western boundary line, where it touches Elmore County, to be either, (1) that originally constituted by the Act of the General Assembly approved December 18, 1832, to-wit: The range line dividing ranges 20 and 21, or (2) the line fixed by the Act approved February 15, 1866, to-wit, the West bank of the Tallapoosa River. But the Respondent claims that the territorial extent and jurisdiction of the Complainant extends in a westerly direction no further than the median line or thread of the stream of the Tallapoosa River."

"* * * The West boundary of Tallapoosa County intersects said dam at a point defined and located as follows: Begin at the Northwest corner of Section 36, T. 20 N., R. 21 E, in Elmore County, Alabama, and run South 139 feet, thence turning an angle 88 degrees and 50 minutes to the left, taking a course South 88 degrees and 50 minutes East, run 2541 feet. This is the point of intersection of the West boundary of Tallapoosa County with said dam. But Respondent claims that the boundary line between said counties at said point lies 125 feet, more or less to the East of the point above defined, that is, at a point coinciding with the median line or thread of the stream of the Tallapoosa River, and Elmore County is now exercising jurisdiction over and collecting taxes upon all that part of said dam, power plant and appurtenances lying West of the median line or thread of the stream of said Tallapoosa River."

We have indicated the averments or further insistence of Tallapoosa county of the immemorial exercise of sovereignty in the territory in question.

It is further averred that all of the dam, power plant, and other appurtenances at said Martin dam are in Tallapoosa county: that "for a distance of 125 feet East of the West line of Elmore County at said dam, and in Tallapoosa County, and that there are other dams and properties along said River over which Elmore County has been lately exercising jurisdiction, and on which properties it has been collecting taxes up to the median line or thread of said River, and the Complainant avers that the taxes so collected by Elmore County have been illegally collected; that said taxes so collected belong to Tallapoosa County, and that the amount of taxes so illegally collected by Elmore County should be ascertained, accounted for and returned into the County treasury of Tallapoosa County." It is further averred that Elmore county is collecting the taxes on said property for said distance indicated above. And by amendment it is alleged that the territory in dispute in fact lies wholly within the limits of Tallapoosa county.

As to the constitutionality of the act creating Elmore county, it is averred, among other things, that "the House of Representatives of the General Assembly of 1865-66 consisted of One Hundred and One (101) members, being one member in excess of the number permitted by each of said Constitutions; and that the Senate of said General Assembly consisted of Thirty-Four (34) members, which

was one Senator more than the number allowed by each of said Constitutions.

"(c) And complainant avers that said House of Representatives and Senate were illegally organized in contravention of the limitations as to membership imposed by each of said Constitutions, and avers that the said Act of February 15, 1866, passed by said General Assembly to create the new County of Elmore, was and is unconstitutional and void;" that the Constitution of 1819, Section 9, article 3, and as amended in 1850, and section 6, article 4, of the Constitution of 1865, contained "a provision guaranteeing to each County one representative in the House of Representatives of the General Assembly, and complainant avers that in the House of Representatives of the General Assembly of 1865—66 there was the full quota of One Hundred (100) members permitted by each of said Constitutions, and that by reason of this fact the General Assembly had no power or authority to then provide the newly created County of Elmore with a Representative in the House of Representatives, and Complainant avers that the Act of February 15, 1866, passed by said General Assembly to create Elmore County was in violation of those provisions of said Constitution guaranteeing to each County one Representative in the House of Representatives, and avers that said Act of February 15, 1866 was and is unconstitutional and void."

The prayer of the bill is for the establishment of the true boundary line between the counties, and for accounting for taxes collected by Elmore county on property within disputed territory.

■ The existence, geographic area, and boundaries of all counties in this state are matters of which the court takes judicial knowledge, and have been recognized, ratified, and confirmed by the adoption of the several Constitutions. Hodge v. Joy, 207 Ala. 198, 92 So. 171; Ullman Bros. v. State, 16 Ala. App. 526, 79 So. 625, and authorities. In the Constitution of 1875, article 2, section 2, is contained in the recital that "the boundaries of the several counties of this State, as heretofore established by law, are hereby ratified and confirmed. The general assembly may, by a vote of two-thirds of both houses thereof, arrange and designate boundaries for the several counties of this State, which boundaries shall not be altered, except by a like vote."

The provision in article 2, section 2, of the Constitution of 1868, that "the General Assembly may, by a two-thirds vote of both houses thereof, arrange and designate boundaries for the several counties of this State, which boundaries shall not be altered, except by a like vote," is also contained in the Constitution of 1865, article 2, section 2, and the Constitution of 1819, article 6, sections 16 and 17.

The apposite provision in the Constitution of 1901 is section 38, declaring "the boundaries of the several counties of this State, *as they now exist* [italics supplied], are hereby ratified and confirmed." The several counties are enumerated (including Elmore and Tallapoosa) in section 202 of the Constitution of 1901; section 6, article 9, Constitution of 1875; article 8, section 2, of the Constitution of 1868, operative June 25, 1868, or July 13, 1868; Code of 1876, p. 120, naming the counties of Tallapoosa and Elmore.

■ It is the common-law rule and that of our statute, section 6524, Code, that suits ex contractu must be brought in the court of the defendant county. Cullman County v. Blount County, 160 Ala. 319, 49 So. 315, 18 Ann. Cas. 322; Houston County v. Henry County, 157 Ala. 246, 47 So. 710. And it is established by the majority of English and American courts that 'action ex delicto based upon a tort against real property is local, and cannot be maintained in a county or state other than that in which the land is located. 42 A. L. R. 197, 208, and authorities. This is the rule or venue of action for the collection of damages or debt. Such is not this action in its primary purpose,—to establish the boundary line,—and with the incident of an accounting. Chambers County v. Lee County, 55 Ala. 534.

■ The nature of the question presented is such that, if there were no statutes expressly fixing venue, courts of equity in either county, when duly invoked, would have the inherent right to determine a disputed question of fact with respect to its boundary line. It is provided in section 6524 of the Code that, "if real estate be the subject-matter of the suit, whether it be the exclusive subject-matter of the suit or not, then in the county where the same, or a material portion thereof is situated."

■ In the strict sense, a county, contesting for the establishment of its boundary line, is not suing for the possession of real property within the meaning of the foregoing statute. Marengo County v. Wilcox County, 215 Ala. 640 [2], 112 So. 243.

In Johnson v. Craft, 205 Ala. 386, 408, 87 So. 375, 395, is the observation which follows:

"In Ex parte Selma & Gulf Rd. Co., 45 Ala. 696, 728, 6 Am. Rep. 722, it is declared that the General Assembly has the same right to construe the Constitution of the state that the courts have, and where the question is one in which a liberal construction may be made, the legislative construction will not be condemned unless it clearly appears that it is wrong. Ward v. McDonald, 201 Ala. 237, 243, 77 So. 827. This is the foundation for the rule of contemporaneous construction announced by the Supreme Court of the United

States. In Cohens v. Virginia, 6 Wheat. 264, 5 L. Ed. 257, Mr. Chief Justice Marshall said:

" 'Great weight has always been attached, and very rightly attached, to contemporaneous exposition.'

"In Bank of the U. S. v. Halstead, 10 Wheat. 51, 62, 6 L. Ed. 264, Mr. Justice Thompson stated that—

" 'If any doubt existed whether the act of 1792 vests such power in the courts [to mould their process as to meet whatever changes might take place], or with respect to its constitutionality, the practical construction heretofore given to it, ought to have great weight in determining both questions.' Ogden v. Saunders, 12 Wheat. 214, 290, 6 L. Ed. 606.

"The rule of contemporaneous construction is announced by our court in State ex rel. Clarke v. Carter, 174 Ala. 266, 279, 56 So. 974, 978, the excerpt from Cooley's Const. Lim. 67, being approved to the effect that—

" 'Where a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the Constitution, or under a Constitution immediately preceeding, and by those who had an opportunity to understand the intention of the Constitution, or a provision thereof in question it is not to be denied that a strong presumption exists that the construction rightly interprets the intention.' "

█ The Constitutions indicated, all the departments of the state, and of the counties of Tallapoosa and Elmore, have recognized the legality or validity of the enactment of the General Assembly in creating Elmore county with the description employed in the Acts of 1866, p. 484. It is too late to raise the question of constitutionality of the act creating Elmore county; the validity of that act has long been acquiesced in by the people and departments of government, and two constitutional conventions, and rights have been vested pursuant thereto under the assumption and presumption of its validity. 36 Cyc. 943; Anderson v. Fisk, 36 Cal. 625; Missouri v. Kansas, 213 U. S. 78, 29 S. Ct. 417, 53 L. Ed. 706, 708.

In Ullman Bros. v. State, 16 Ala. App. 526, 529, 530, 79 So. 625, 628, is the pertinent observation as follows:

"In Doe ex dem. Miller v. Cullum, 4 Ala. 576, it is said:

" 'The boundary lines of counties are but seldom marked by natural objects, or artificial monuments, discernible to the naked eye. Often, they are referred to the lines of the governmental surveys of the public lands, and sometimes to places designated by names, which change, or become obsolete. There is no provision of law requiring the survey and marking of the boundaries, and a record of it as evidence of the fact. The boundary is of consequence subject to parol evidence; and, if its location is a matter of dispute generally, it must be left to the jury to say where is its true location.' Tidwell v. State, 70 Ala. 33.

"In the case last above cited, it was said with reference to the boundary line of Tuscaloosa county:

" 'From the organization of the county until the last four or five years, one of these ridges had been uniformly recognized as forming the boundary. There had been neither doubt nor dispute about the fact, and to it the county had exercised jurisdiction, and the citizens residing near to and within the boundary, having * * * interest in the fact, and the best opportunities of ascertaining the precise line, had acquiesced * * * and exercised the privileges of citizens of Tuscaloosa county. The territorial boundaries of public municipal jurisdictions, when they grow to be ancient, are unmarked by artificial monuments, and, when there is not of them higher evidence, may be proved by general reputation. Morgan v. Mayor, 49 Ala. 349; 1 Phill. Ev. (C. & H. notes), note 87, pp. 218, 219. Long, continuous, uninterrupted user, when lines and boundaries depend upon statutory references to physical objects which are not well defined, is a practical interpretation of the statute courts must adopt, or involve the citizens relying upon them in embarrassments and uncertainties, not only as to rights of property, but as to personal rights.'

"These observations are pertinent to the case in hand. Here it is a matter of little or no importance to appellants whether their lands be situated in the county of Calhoun or the county of Cherokee, or whether they pay taxes to the one or to the other. On the other hand, it is of great importance to the public that the settled conditions that have existed for half a century be not disturbed, making appropriate the admonition of Proverbs, 22:28. 'Remove not the ancient landmarks which thy fathers have set.' * * *

"And again, in Indiana v. Ky., 136 U. S. 479, 10 S. Ct. 1051, 34 L. Ed. 329:

" 'It is a principle of public law, universally recognized, that long acquiescence in the possession of territory and in the exercise of dominion and sovereignty over it is conclusive of the nation's title and rightful authority. * * * No human transactions are unaffected by time. Its influence is seen in all things subject to change, and this is peculiarly the case in regard to matters which rest in memory, and which consequently fade with the lapse of time and fall with the lives of individuals. For the security of rights, whether states or individuals, long possession under a claim of title is protected. And there is no controversy in which this great principle may be invoked with greater

justice and propriety than in a case of disputed boundary.'"

And in Marengo County v. Wilcox County, 215 Ala. 640, 112 So. 243, it was held that a county may properly invoke remedies of equity to determine location of disputed boundary between counties; and that county boundaries acquiesced in for many years will not be disturbed unless clearly wrong.

■ It may be well to observe that in a proper case the disputed boundary line may be settled by suit duly filed in courts of the complaining county. The case of Putnam County v. White County, 140 Tenn. 19, 203 S. W. 334, 337, is directly in point. In that case, a controversy arose between those two counties touching the boundary line, and Putnam county filed a bill in the courts of that county to have the controversy determined. White county demurred to the original bill on the ground that a municipal corporation, such as White county, could only be sued in the county in which it was located. The court said:

"Such is the general rule (citing authorities). An apparent exception is made to this rule in the case of a suit by one county to recover disputed territory from an adjoining county or to prevent an encroachment under an invalid statute. Such suits have uniformly been brought and entertained in the courts of the complaining county. Maury County v. Lewis County, 1 Swan (31 Tenn.) 236, was brought in the chancery court of Maury county. Marion County v. Grundy County, 5 Sneed (37 Tenn.) 490, was brought in the chancery court of Marion county. Bridgenor v. Rodgers, 1 Cold. (41 Tenn.) 259, which was a suit by Bridgenor and by Bledsoe county of the character above indicated, against Sequatchie county, was brought in the chancery court of Bledsoe county. Roane County v. Anderson County, 89 Tenn. 259, 14 S. W. 1079, was brought in the chancery court of Roane county. McMillan v. Hannah, 106 Tenn. 689, 61 S. W. 1020; asserting the right of Cheatham county against Dickson county to a disputed strip of territory, was brought in the chancery court of Cheatham county. Putnam County v. Smith County, 129 Tenn. 394, 164 S. W. 1147, was brought in the chancery court of Putnam county. See, also, Union County v. Knox County, 90 Tenn. 541, 18 S. W. 254."

Among the cases thus cited is that of Union County v. Knox County, 90 Tenn. 541, 18 S. W. 254, 255, wherein a similar controversy was involved, and the court said:

"The *territory* continued to be that of Union county, and when Knox county, entered upon it, and assumed jurisdiction of it, that county was a trespasser, within the boundary of the other, and suit was properly brought in the latter."

The case of People ex rel., etc., v. District Court of the Fifth Judicial District, etc., 66 Colo. 40, 179 P. 875, 876, is also in point. Under statutory provisions in that state, the state engineer had located a line with which one of the counties was dissatisfied, and, claiming that this was not the line fixed by the Legislature, that county commenced an action, as provided by statute, to settle and determine the true line. A change of venue to Summit county was sought on the ground that defendant county was the only county that had jurisdiction. The motion was denied. It is there said:

"Petitioner argues two points: First, that the action comes within the category 'in all other cases,' mentioned in section 29 of the Code, and, for this reason, should be tried in Summit county. The second is based upon the report, lodged with the county clerk, of the line run by the state engineer, by virtue of which it is claimed the property is presumptively within Summit county until such time as the report of the engineer is overthrown, and therefore the action should be tried in Summit county.

"(1) As to the first proposition, the Code provides that actions affecting property shall be tried in the county where the property is situated; that actions for the recovery of real property, or any interest therein, or for the determination of any form of such interest or right, shall be tried in the county where the subject of the action is situated. The subject of this action is the disputed territory alleged to be situated in Lake county, and the object of the action is to judicially define and settle the boundary line, as fixed by the Legislature. The disputed territory includes all the property within its boundaries, and such property is affected by the action, which will determine the county that has certain rights in relation thereto. A county has an interest, and a form of a right, in the property within its boundaries. The boundary affects the rights of the counties; the rights of the people therein, and property rights within the territory; the rights of the respective counties for purposes of taxation; the rights of the county to ownership and possession of, and control over, roads and highways within the territory; and the jurisdiction of courts over the trial of actions. So we reach the conclusion that the action involves an interest in real property, that it is for the determination of a form of an interest or right in real property, and that it affects property, and should be tried in the county where the property is situated."

In the case of Marengo County v. Wilcox County, supra, the question of venue was not debated, nevertheless both parties and the court treated the bill exhibited by Wilcox county as properly filed in that county.

We have indicated there is nothing to be found in Cullman County v. Blount County, 160 Ala. 319, 49 So. 315, 316, 18 Ann. Cas. 322,

which militates against the proposition asserted. It must be conceded that, if a county is simply attempting to collect a debt, or enforce an ordinary contractual obligation against another county, the action under the statute must be prosecuted in the courts of the defendant county. Such was the ruling in the attempt on the part of Blount county to collect from Cullman county, an ordinary debt or liability. And in that case, when the court said: "As a general rule all suits against a county must be brought in the courts of the defendant county," it was speaking with reference to the facts of the particular case, and announced the "general" rule in such a case.

■■ If the eleventh paragraph of the bill, set out above, is taken as true, as it must be on demurrer, then the usage and long acquiescence of these counties in the line which complainant alleges to be the true boundary line becomes a justiciable question. Marengo County v. Wilcox County, 215 Ala. 640, 112 So. 243, 245; Ullman Bros. v. State, 16 Ala. App. 526, 79 So. 625. This principle was recognized in the Marengo County v. Wilcox County Case, supra, when the court declared that, while mere laches or acquiescence can not change the location of the county's boundaries, as fixed by law, since the Legislature alone has that authority, yet long acquiescence, etc., are "matters are strongly persuasive that the line so recognized is the line intended," and "unless clearly wrong, lines so recognized, acted upon, and acquiesced in will not be disturbed"—citing several supporting cases.

In Oklahoma v. Texas, 272 U. S. 21, 47 S. Ct. 9, 16, 71 L. Ed. 145, 155, the United States Supreme Court held that "governments, as well as private persons, are bound by the practical line that has been recognized and adopted as their boundary." Bean v. Morris, 221 U. S. 485, 31 S. Ct. 703, 55 L. Ed. 821; Missouri v. Iowa, 7 How. 660, 670, 12 L. Ed. 861; New Mexico v. Colorado, 267 U. S. 30, 40, 45 S. Ct. 202, 69 L. Ed. 499, 502.

It was expressly held in Putnam County v. White County, 140 Tenn. 19, 27, 203 S. W. 334, and Putnam County v. Smith County, 129 Tenn. 394, 164 S. W. 1147, that acquiescence in the possession by one county of disputed territory for a period of twenty years would be such laches as to estop or conclusively bar an assertion of right or title hostile to that county.

■■ If the bill shows on its face that it is filed in the wrong court, the question of improper venue or jurisdiction can be raised by motion to dismiss or by demurrer. Kyser v. American Surety Co., 213 Ala. 614, 105 So. 689; Riles v. Coston-Riles Lumber Co., 208 Ala. 508, 512, 95 So. 43; Crawford v. Walter, 202 Ala. 235, 80 So. 73; Pucket v. Pucket, 174 Ala. 315, 56 So. 585; Harwell v. Lehman,

Durr & Co., 72 Ala. 344; Campbell v. Crawford, 63 Ala. 392; Lewis v. Elrod, 38 Ala. 17. And it was by demurrer that the question of the right to maintain the bill in the court of Tallapoosa county was raised by defendant, Elmore county. There was no error in overruling demurrer of respondent challenging complainant's right to file the bill in Tallapoosa to establish disputed boundary.

Has the fact of existence of Elmore county as a county, and also its boundary line between the two counties in question been determined, *to be at the point in question*, as the middle or thread of the Tallapoosa river? Tallassee Falls Mfg. Co. v. State, 194 Ala. 554, 69 So. 589; Id., 13 Ala. App. 623, 68 So. 805.

The tax proceedings in the last cited case were when "the State of Alabama proposed to assess the property of the Tallassee Falls Manufacturing Company, situated west of the thread of the Tallapoosa River in Elmore County, and from a judgment so fixing it, the Tallassee Falls Manufacturing Company appeals to the Court of Appeals, where the judgment of the nisi prius court was reversed and remanded. See 13 Ala. App. 623, 68 So. 85." The state petitioned certiorari to review and revise the judgment of the Court of Appeals. Writ was granted, and the judgment of the Court of Appeals reversed and remanded. That result depended upon the meaning assigned to the descriptive words, "west of the Tallapoosa River," as the east boundary of Elmore county *at the point in question*, and situs of that taxable property.

The case last cited was rested upon an agreed statement of facts that was ordered set out by the reporter by the Court of Appeals; it was not set out.

In Handly's Lessee v. Anthony, 5 Wheat. 374, 379, 5 L. Ed. 113, the Supreme Court of the United States held that the cession by Virginia to the United States of her right to northwest territory "situate, lying and being northwest of the River Ohio," was relinquishment of title above the low-water mark on the northwestern bank of that river. This decision was by Mr. Chief Justice Marshall in the ascertainment and declaration of the boundary of Kentucky. The Chief Justice said:

"In pursuing this inquiry, we must recollect, that it is not the bank of the river, but the river itself, at which the cession of Virginia commences. She conveys to congress all her right to the territory 'situate, lying and being to the north-west of the river Ohio.' And this territory, according to express stipulation, is to be laid off into independent states. These states, then, are to have the river itself, wherever that may be, for their boundary. This is a natural boundary, and in establishing it, Virginia must have had in view *the convenience of the future population* of the country.

"When a great river is the boundary be-

tween two nations or states, if the original property is in neither, and there be no convention respecting it, each holds to the middle of the stream. But when, as in this case, one state is the original proprietor, and grants the territory on one side only, it retains the river within its own domain, and the newly-created state extends to the river only. The river, however, is its boundary.

" 'In case of doubt,' says Vattel, 'every country, lying upon a river, is presumed to have no other limits but the river itself; because nothing is more natural, than to take a river for a boundary, when a state is established on its borders; and wherever there is a doubt, that is always to be presumed which is most natural and most probable.' "

The east boundary of Alabama and Georgia was held to be "mean stage of water" on the west bank of the Chattahoochee river. The act of Congress (1 U. S. Stat. 549) establishing the Mississippi territory describes "all that tract of country bounded on the west by the Mississippi * * * on the east by the river Chatahouchee." The articles of cession and agreement employ the descriptive terms, "west of a line beginning on the western bank of the Chattahoochee river * * * running thence up the said river Chattahoochee and along the western bank thereof," etc. Code 1928, §§ 85, 86; Aiken's Digest, pp. 29, 30, § 4; Toulmin's Digest, pp. 76, 78; Clay's Digest, p. 48, §§ 4, 6, and 9; Bosarge v. State, 219 Ala. 154, 121 So. 427; Howard v. Ingersoll, 17 Ala. 780; Handly v. Anthony, 5 Wheat. 374, 5 L. Ed. 113; Howard v. Ingersoll, 13 How. 381, 14 L. Ed. 189; Alabama v. Georgia, 23 How. 505, 16 L. Ed. 556.

In Oklahoma v. Texas, 260 U. S. 606, 43 S. Ct. 221, 223, 67 L. Ed. 428, Mr. Justice Van Devanter said:

"We therefore are concerned with an instance in which the bank of a river, and not the river itself, has been made the boundary between two nations—now between two states of the Union.

"In many jurisdictions it is settled that there is a material difference between taking the bank of a river as a boundary and taking the river itself, and this rule has been recognized and applied by this court from an early time in the adjudication of controversies over state boundaries.

"During the Revolutionary period Virginia ceded to the United States all her 'territory northwest of the river Ohio.' Afterwards Kentucky and Indiana were admitted into the Union as states, with the southerly or initial line of that cession as the boundary between them. A controversy over that boundary was brought before this court in Handly v. Anthony, 5 Wheat. 374, 5 L. Ed. 113. The question presented was whether the boundary was along low-water mark or at the line

reached by the river when at medium height. In an opinion delivered by Chief Justice Marshall the court held the boundary was along low-water mark, but was careful to say: 'In pursuing this inquiry, we must recollect that it is not the bank of the river, but the river itself, at which the cession of Virginia commences.' Mr. Justice Story participated in the decision of that case and concurred in the opinion. Subsequently, when holding the circuit court for the district of Maine, he had occasion to interpret two conveyances of land adjacent to a stream in that state. One tract was described as bounded by the stream from one point to another, and the other as bounded by the bank of the stream from one point to another. The learned justice was of opinion that the two bounding lines were essentially unlike, and he held as to the first tract that the conveyance included the flats below the bank at least to low-water mark, and as to the second that the conveyance limited the grant to the bank, and excluded the flats below. Thomas v. Hatch, 3 Sumn. 170, Fed. Cas. No. 13,899.

"A controversy over the boundary between Georgia and Alabama was before this court in Howard v. Ingersoll, 13 How. 381, 14 L. Ed. 189. The boundary had been defined in a cession by Georgia to the United States as beginning on the western bank of the Chattahoochee river where it crosses a stated line and running thence up the river 'along the western bank thereof' to the great bend. See 1 American State Papers, Public Lands, pp. 113–114. The nature of the controversy was such that it called for an interpretation and application of the words just quoted. At the locus there was an abrupt and high bank on the western, or Alabama, side which was washed by the river in periods of ordinary high water. In periods of low water, which comprised two-thirds of the year, a sloping strip of from 30 to 60 yards of dry land lay between the abrupt bank and the water. The flowing stream was about 200 yards wide in periods of ordinary high water and about 30 yards in periods of low water. At that point the water never reached the top of the abrupt bank, but at other points, where the bank was lower, the water in exceptional times of flood overflowed the bank and temporarily submerged adjacent lands. The case was tried in an Alabama court, which ruled that the boundary was at the line of ordinary low water. That ruling was sustained by the Supreme Court of the state (17 Ala. 780), and the case was brought here on writ of error. Another case involving the same questions, and brought here from the Circuit Court for the District of Georgia, was heard at the same time, but a description of the first suffices for present purposes. This court, upon much consideration, held that the boundary was not at the line of ordinary low water, but along the water-washed bank or elevation

which bounds the river bed and confines the water within definite outer limits, save in the exceptional instances when it is so far at flood that it overflows its restraining banks and spreads over adjacent lands."

In Missouri v. Kansas, 213 U. S. 78, 29 S. Ct. 417, 419, 53 L. Ed. 706, 708, the descriptive words of the Act of Congress of June 7, 1836 (chapter 86, 5 Stat. 34), were "the western boundary of said State shall be then extended to the Missouri river," "when the Indian title to all the lands lying between the State of Missouri and the Missouri river shall be extinguished," etc.; held:

"Whatever might be the interpretation of the act, taken by itself and applied between two long-settled communities, we think that the circumstances and the history of the steps that led to it show that the object throughout was that expressed by the memorial; as we have said, not to gain some square miles of wilderness, but to substitute the Missouri river for an ideal line as the western boundary of the state, so far as possible; that is, from the northern boundary to the mouth of the Kaw. That this was understood by Missouri to be the effect of the act is shown by a succession of statutes declaring the boundaries of the river counties in this part. They all adopted the middle of the main channel of the river; beginning with the act that organized the county of Platte, approved December 31, 1838, Mo. Laws, 1838, pp. 23–25, and going on through the Revised Statutes of 1855, p. 459, § 12 (Clay), p. 466, § 33 (Platte), p. 478, § 65 (Jackson), etc., to 2 Rev. Stat. 1879, chap. 94, §§ 5177, 5198, and 5237. The construction is contemporaneous and long-continued, and we regard it as clear. It is confirmed by the cases of Cooley v. Golden, 52 Mo. App. 229, and St. Joseph & G. I. R. Co. v. Devereux [C. C.] 41 F. 14, both of which cases notice that the act extended the boundary to the river, and not merely to the bank. * * *

"We are of opinion that the limit implied is a point in the middle of the Missouri opposite the middle of the mouth of the Kaw."

And in Indiana v. Kentucky, 136 U. S. 479, 10 S. Ct. 1051, 34 L. Ed. 329, the decision followed that in Handly v. Anthony, 5 Wheat. 374, 5 L. Ed. 113, holding that the jurisdiction of Kentucky was to "what was then low-water mark on the north side of the channel" of the Ohio river.

■ The method of designation of *counties* employed in this state, and the construction thereof, were of legislative intent. We are in accord with the statement made and illustrations employed by Mr. Justice Sayre in Tallassee Falls Mfg. Co. v. State, 194 Ala. 554, 69 So. 589, though they may appear not to have been in full accord with the foregoing decisions dealing with the boundary lines of states and territories. And the foregoing

federal decisions are not of controlling effect as to legislative intent, when, as here, the county boundaries in question do not touch and affect another state. See Acts of 1907 (Local Acts, p. 758) and the decision of Tallassee Falls Mfg. Co. v. Commissioner's Court, supra, affecting the delegation of power of regulation of the toll bridge in question, sustained in Tallassee Falls Mfg. Co. v. Commissioner's Court, 158 Ala. 263, 48 So. 354.

■ As affecting these counties within the state of Alabama, and not those contiguous in another state, it may be noted that the description employed in tne Act of 1865–6, p. 484, creating Elmore county, is not applied to the "west bank" of the river, but to the line fixed in that act as "west of the Tallapoosa river." This court takes judicial notice of that act and of its decision in Tallassee Falls Mfg. Co. v. State, 194 Ala. 554, 69 So. 589, construing the act to mean that the boundary between the two counties at the point in question is the thread or median line of that stream. The case last cited, between taxing authorities and the manufacturing corporation, is not decisive of the question of jurisdiction. Marengo County v. Wilcox County, 215 Ala. 640 (3), 112 So. 243.

The judgment of the circuit court is affirmed.

Affirmed.

ANDERSON, C. J., and GARDNER and BOULDIN, JJ., concur.