LIVINGSTON, C. J., and LAWSON and STAKELY, JJ., concur.

94 So.2d 777

**ST. CLAIR COUNTY**

v.

**CALHOUN COUNTY.**

**7 Div. 311.**

Supreme Court of Alabama.

March 7, 1957.

Rehearing Denied May 9, 1957.

Frontis H. Moore, Samuel H. Burr and Burr, McKamy, Moore & Thomas, Bir-

mingham, and John R. Robinson, Ashville, for appellant.

R. E. Jones and Walter J. Merrill, Anniston, for appellee.

PER CURIAM.

This is an appeal from a decree in equity sustaining a demurrer to a cross bill. The original bill is by Calhoun County against St. Clair County. The respondent filed the cross bill.

The purpose of both bills is to determine a controversy between those two counties as to the location of the dividing line between them. St. Clair County contends that it is on the east bank of the Coosa River, while Calhoun County contends that it is the thread of the stream of the Coosa River—sometimes called the thalweg.

The question here involved does not arise by reason of any alleged change in the thalweg by avulsion or accretion, as in State of Arkansas v. State of Tennessee, 310 U.S. 563, 60 S.Ct. 1026, 84 L.Ed. 1362. But the question is whether the boundary line fixed by law is the thread of the river or whether it is on the east bank of the river. Similar principles of law are here applicable as were in the controversy between Elmore County and Tallapoosa

County with respect to the Tallapoosa River. Those cases are reported as follows: Tallassee Falls v. State, 194 Ala. 554, 69 So. 589; Elmore County v. Tallapoosa County, 221 Ala. 182, 128 So. 158; Id., 222 Ala. 147, 131 So. 552; Tallapoosa County v. Elmore County, 230 Ala. 440, 161 So. 500.

But the statutes which control the instant case are not identical in respects here material with the one involved in the Elmore-Tallapoosa cases, supra.

The first Act of importance here material was approved December 18, 1832, Act No. 11, page 9 of Acts 1832. Section 1 of that Act created the County of Benton (whose name was afterwards changed to Calhoun, as it is at the present time), and fixed its boundaries. Section 2 of the Act created the County of Talladega lying south of Benton (Calhoun) County and fixed its boundaries (the Act also created other counties). Both Benton and Talladega Counties were carved out of St. Clair County, and substantially the same language (here material) was used in describing them both.

In creating Benton (Calhoun) County, section 1 of the Act, supra, describes its boundaries as follows:

"Beginning at a point *on the east bank of the Coosa River* opposite the mouth of Will's Creek, thence due east to the line dividing the State of Alabama from Georgia; thence along said line to the line between Townships 16 and 17; thence due west along said line to the east bank of the Coosa River; *thence up said river to the beginning;* shall constitute one separate and distinct county, to be called and known by the name of Benton."

It is important to note that the point of beginning is on the east bank of the Coosa River, and extends due east to the dividing line between Alabama and Georgia and down said line to a designated point; thence

due west to the east bank of the Coosa River; *"thence up said river to the beginning".*

Another Act of the Legislature, that of 1834, approved December 30, 1834, Act No. 7, Acts 1834, page 5, is thought to have influence on the instant controversy. This Act undertakes to attach to Benton (Calhoun) County an area described as follows:

"That all that section of the country east of the Coosa River, commencing at the mouth of Wills' Creek,[1] and running up said river to Childress's Ferry, and from thence following the Georgia road from the said ferry to the Georgia line, be, and the same is hereby attached to Benton County, and the said Coosa River on one side and the Georgia road on the other, are hereby made and established as the county boundaries of the said counties."

The above described area was later detached, and was made a separate county and called Cherokee. It is described in the Act approved January 9, 1836, Act No. 179, Acts 1836, pages 170–171, as follows:

"All that tract of country bounded as follows, viz.: Beginning at a point on the east side of the Coosa River opposite to the mouth of Wills' Creek, thence due east with the north line of Benton County, to the line dividing the State of Alabama from the State of Georgia; thence along said line in a northwestern direction to a ridge dividing the waters of Big Wills' Creek from the waters of Little River and Yellow Creek, in a southwestern direction to a ford on Big Wills' Creek to the beginning, shall constitute one separate and distinct county, to be called and known by the name of Cherokee."

■ (1) The principle of law on which the decree of said trial court was founded, and which is set out in appellee's brief, is correctly stated and is that the boundary

"(1 This creek flows into the river on the west side of it.)"

line between the two adjoining counties described by the legislature as running up, down or along a river establishes as a matter of law that the thread of the stream is the true boundary line. There seems to be no controversy as to that principle. In the Elmore-Tallapoosa cases, supra [221 Ala. 182, 128 So. 164;] the Act created Elmore County partly out of Tallapoosa County " 'west of the Tallapoosa River' ". Gen.Acts 1865–66, p. 484. The principle above stated was applied in a manner which seems generally to conform to the authorities, so as to make the line between Elmore and Tallapoosa Counties the thread of the Tallapoosa River.

Reference also was made in the first of the Elmore-Tallapoosa cases, Tallassee Falls v. State, supra [194 Ala. 554, 69 So. 590] to the fact that "on frequent occasions the Legislature has described the lines it intended to fix as running up, down, or along water courses. This, without more, according to all the authorities, fixed the lines it intended to describe at the middle of the stream, whether it carried a large or small volume of water; and this, too, though the line of approach or departure be described as *running to or from one bank of the stream.* [citing] Howard v. Ingersoll, 13 How. 381, 14 L.Ed. 189." In the Elmore-Tallapoosa cases the court was not dealing with the *bank* of a river as the dividing line, but an area lying " 'west of the Tallapoosa River' ".

(2) *The rule when an area is ceded by its owner:* In the Tallassee Falls case, supra, the Court referred to Handly's Lessee v. Anthony, 5 Wheat. 374, 5 L.Ed. 113, as does practically every case on the subject. The State of Virginia had ceded to the United States "all her territory * * * 'northwest of the River Ohio' ". It was held to make the low water mark the line of separation. It was also noted in the Tallassee Falls case that in the Handly case the United States Supreme Court was dealing with a grant by Virginia, and this Court observed: "But we consider that the peculiar rules of construc-

tion obtaining in cases of grant upon which those cases were determined shed but little light upon the question now at issue".

The case of Howard v. Ingersoll, supra, arose over the boundary line between Georgia and Alabama as it affected personal rights on the west bank of the Chattahoochee River between high and low water levels. The appeal involved two cases, one in Georgia and one in Alabama. Howard v. Ingersoll, 17 Ala. 780. Georgia had ceded to the United States territory, now Alabama, west of the line "beginning on the western bank of the Chattahoochee River where the same crosses the boundary line between the United States and Spain, running thence up said River Chattahoochee, and along the western bank thereof, to the great bend next above the place, where a certain creek or river called Uchee * * * empties into the Chattahoochee River". The controversy was whether the line on the "western bank" was the low water line or the high water line. The Supreme Court of Alabama held that it was the low water line and observed (17 Ala. at page 792) : "that if the grant be limited to the bank of the river, the land covered by the water will not pass by it, that is, the bed of the river will not be granted". On appeal of those cases (one from Alabama and one from Georgia), the United States Supreme Court held, see headnote 3 of Howard v. Ingersoll, 13 How. 381, 14 L.Ed. 189, that "when Georgia ceded to the United States all the land situated on the west of a line running along the *western bank* of the Chattahoochee River, she retained the bed of the river and all land to the east of the line above mentioned". Both the Handly's Lessee v. Anthony case and the Howard v. Ingersoll case referred to territory *ceded by its owner to another.*

(3) *When the "bank" is distinguished from the "river":*

The United States Supreme Court in Howard v. Ingersoll, supra, used this language in construing the grant above shown by Georgia to the United States of what is now Alabama land:

"If the language of the article had been, 'beginning on the western bank of the Chattahoochee, *and running thence up the river,' and no more had been said, the middle thread of the river ordinarily,* and without any reference to the fact that Georgia was the proprietor of the river, it would have been said to be the dividing line between the two states. But there is added '*running up the said River Chattahoochee and along the western bank thereof'*. This last controls any uncertainty there may be; for if the first call or object to locate the line is the bank of the river, it is plain that the western limit of Georgia on and along the bank of the river, must be where the bank and the water meet in its bed within the natural channel or passage of the river. The words 'along the bank,' added to the words, 'on the bank,' distinguish this case from all of those in which courts have had the greatest difficulty where a line was to be fixed when it is on the bank without a call for the stream or along the river, or up or down the river. Angell 19. Along the bank, is strong and definite enough to exclude the idea that any part of the river or its bed was not to be within the State of Georgia. It controls any legal implication of a contrary character. Such a line, too, satisfies the calls on and along the bank in the navigable and unnavigable parts of the river. In the former, Alabama has all the uses of the river, including the use of the western bank for navigation and commerce, which the State of Georgia can claim. In that part of the river not navigable, Georgia has both soil and jurisdiction for all such purposes as are implied by both, and the stream or water of the river for all such purposes as it may be used in any stage of the water.

"Such a line may be made certain on every part of the river, whatever may be the changes on the western bank from washings, the abrasions of extraordinary floods, or from any of those sudden causes which in nature change the beds of rivers. In such cases the proprietors would continue to hold according to the original boundaries of their grants. *We repeat, 'along the bank thereof,' is the controlling call in the interpretation of the cession.* It excludes the idea that a line was traced at the edge of the water as that may be at one or another time or at low water, or the lowest low water. Water is not a call in the description of the boundary, though the river is, and that, as we have shown, does not mean water alone, but banks, shores, water, and the bed of the river. If water, as one of the river's parts, had been meant, it would have been so expressed." (Italics ours.)

Later a bill was filed in the United States Supreme Court by the State of Alabama against the State of Georgia for the purpose of ascertaining the boundary line between them. State of Alabama v. State of Georgia, 23 How. 505–515, 64 U.S. 505, 16 L.Ed. 556. It was contended that the decision in Howard v. Ingersoll, 13 How. 381, 14 L.Ed. 189, did not fix with certainty the location of the boundary line. The court quoted many cases and authorities, defining the "bank" of a river and the applicable rules, and rejected as it had done previously the opinion of the Alabama Supreme Court in Howard v. Ingersoll, 17 Ala. 780, that the low water line of the river was the boundary between the states along the Chattahoochee River; but held that Georgia retained the soil and jurisdiction in the bed of the river, which includes "that portion of its soil which is alternately covered and left bare, as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during the entire year, without reference to the extraordinary freshets of the winter or spring or the extreme droughts of the summer or autumn".

The Act creating Benton (Calhoun) County does not carry the same description

as in the Elmore-Tallapoosa cases, supra, nor as in the Georgia-Alabama cases, supra. As we have said, here we have a starting point on the *east* bank of the river, describing the line as extending back due east to the Georgia-Alabama line then down that line and from it due west to the east *bank* of the river, but then follows *"thence up said river* to the beginning".

█ It was observed in the Tallassee Falls case, supra, that there seems to run through the acts of the legislature where rivers are the boundaries, a purpose to fix them so that the dividing line is the thread of the stream. Such is the effect of the Act, supra, which added territory to Benton (Calhoun) County on the north and then made Cherokee County out of it, and also created other counties.

With emphasis added by the language which we have quoted from the United States Supreme Court in Howard v. Ingersoll, supra, we are clear that the legal interpretation of the description of the west boundary line of Benton (Calhoun) County is that it extends along the thread of the Coosa River.

█ It is a settled principle that possession of one county and acquiescence by the other cannot serve to change the boundary line fixed by law between counties, Marengo County v. Wilcox County, 215 Ala. 640, 112 So. 243; and that they only serve as an aid in the interpretation of an ambiguous description of it or in finding its location when obliterated by any cause. The authorities supporting that view are fully stated in Elmore County v. Tallapoosa County on both appeals, supra.

The cases cited by appellant which permitted such proof were where the boundary line as described had been obliterated and not marked by natural objects or artificial monuments, and their location was a matter of dispute. Tidwell v. State, 70 Ala. 33(3); Marengo County v. Wilcox County, 215 Ala. 640, 112 So. 243; Ullman Bros. v. State, 16 Ala.App. 526, 79 So. 625.

█ Since it is our view that there is no ambiguity in the description of the line between Calhoun and St. Clair Counties, when analyzed according to legal principles, and as defined by the Act of the Legislature, supra, and its location thus defined has not become uncertain, we conclude, as the Court did in Elmore County v. Tallapoosa County, supra, that acquiescence has no place in the inquiry. The result of this discussion is to show that there was no error in sustaining the demurrer of Calhoun County to the cross bill of St. Clair County filed in this cause, and that the decree should be affirmed.

The foregoing opinion was prepared by FOSTER, Supernumerary Justice of this Court, while serving on it at the request of the Chief Justice under authority of Title 13, section 32, Code, and was adopted by the Court as its opinion.

Affirmed.

LIVINGSTON, C. J., and LAWSON, STAKELY and MERRILL, JJ., concur.